2023 PA Super 130

| | | |
|---|---|---|
| PENNENERGY RESOURCES, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WINFIELD RESOURCES, LLC AND | : | No. 464 WDA 2022 |
| MDS ENERGY DEVELOPMENT, LLC | : | |

Appeal from the Order Entered April 8, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-19-008604

BEFORE: OLSON, J., NICHOLS, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                    **FILED: July 25, 2023**

PennEnergy Resources, LLC (PennEnergy) appeals from the order of the Court of Common Pleas of Allegheny County (trial court) denying its petition to vacate an arbitrator's award of $2.4 million in damages in favor of MDS Energy Development, LCC (MDS).

Briefly, PennEnergy and Winfield Resources, LLC (Winfield) entered an agreement to develop gas leases in Western Pennsylvania. Winfield later wanted to transfer part of its interest in the venture to MDS. The two executed an agreement under which MDS would get almost half of Winfield's working interest and Winfield would get membership units in a not-yet-identified MDS limited partnership that would develop the working interest. PennEnergy rejected the transfer and initiated arbitration against Winfield. After being

---

* Retired Senior Judge assigned to the Superior Court.

joined to the arbitration, MDS counterclaimed for tortious interference with contract but waited until the arbitration hearing to disclose that it was prosecuting its claim for not only itself but also 2017 Marcellus Shale Development-LP (MDS 2017), the limited partnership intended to receive the working interest. While not disputing that a general partner may prosecute a claim on a limited partnership's behalf, PennEnergy objected to MDS not disclosing that it was doing so until the arbitration. In his final award, the arbitrator recognized that MDS was proceeding as general partner for MDS 2017 and awarded it $2.4 million in damages after finding that PennEnergy tortiously interfered with the putative transfer between Winfield and MDS. PennEnergy petitioned to vacate the award of damages and made several arguments based on MDS prosecuting the claim in a representative capacity. For its part, MDS countered that it could litigate the claim because it was MDS 2017's managing general partner and PennEnergy knew about the limited partnership's role before the hearing. Finding this argument persuasive, the trial court confirmed the award.

On appeal, PennEnergy asserts several arguments for why the arbitrator's award should have been vacated. Among others, PennEnergy contends that the award was fundamentally unjust and beyond the arbitrator's power because: (1) MDS never disclosed that it was acting in a fiduciary capacity for the real party in interest that suffered damages, MDA 2017; (2) there was no arbitration agreement between PennEnergy and MDS 2017; and

(3) MDS 2017 was not an intended beneficiary of Winfield and MDS's agreement. For the reasons set forth in this Opinion, we reverse and vacate the trial court's order confirming the arbitration award of damages.

## I.

## A.

In February 2012, PennEnergy entered into an asset purchase and sale agreement (APSA) to buy gas leaseholds and rights from Snyder Associated Companies and several of its affiliates, including Winfield. A few months later, as required by the APSA, PennEnergy and Winfield entered into a joint development agreement (JDA) to develop the leases within an 88,000-acre area of mutual interest (AMI) in Butler and Armstrong Counties. Under the agreement, PennEnergy owned about 80 percent of the working interest within the AMI while Winfield's portion was almost 20 percent.

The dispute arose a few years later when Winfield notified PennEnergy that it intended to transfer its working interest in three contract areas within the AMI to MDS. In November 2017, Winfield notified PennEnergy of the potential transfer through a draft "Notice of Joinder" naming MDS as the transferee of its interest in the JDA. Under § 6.2 of the JDA, Winfield had a right to transfer all or part of its interest provided that:

> A Transfer by any Party that is permitted pursuant to Section 6.1 shall not be effective unless each other Party has received a document executed by both the transferring Party (or its legal representative) and the permitted transferee that includes: … (b) such permitted transferee's express agreement in writing to **be bound by all of the terms and conditions** of this [JDA] and the

> Applicable Operating Agreements; ... and (d) representations and warranties from both the transferring Party and the permitted transferee that the Transfer was made in accordance with applicable Law (including state and federal securities Law) and the terms and conditions of this [JDA] and any applicable Associated Agreements.

JDA, 7/12/12, ¶ 6.2 (R. 86a-87a) (emphasis added).

PennEnergy did not consent to the joinder because MDS would not agree to be bound by all the provisions in the JDA. Their disagreement centered on whether MDS would be subject to the JDA for the entire AMI or only the geographic area involved in the transfer.

Notwithstanding PennEnergy's refusal to consent to joinder, on February 5, 2018, Winfield and MDS executed a purchase and sale agreement (PSA). The PSA states that the Seller (Winfield) agreed to sell, assign and transfer 9.93 percent of Winfield's working interest from its participating interest share from the JDA. MDS would in turn assign the working interest to a not-yet-identified limited partnership of which MDS would be the managing general partner. As compensation for the transfer, Winfield would receive units in that unidentified limited partnership, later denominated as MDS 2017.[1] The PSA also provided that "[o]nly the parties hereto, their respective successors and permitted assigned are intended to benefit from this Agreement and no other

---

[1] We note that after reviewing the record, we find no evidence that MDS ever assigned the interest it received in the PSA to MDS 2017.

Party, including the Limited Partnership, is intended to be a beneficiary hereof."

Concurrent with their agreement, Winfield and MDS sent PennEnergy notice of joinder. As laid out in the notice, MDS agreed only to be bound by the JDA "specifically as it relates to and limited to" the three contract areas within the AMI that it was receiving. Upon receiving the notice, PennEnergy rejected it and challenged the validity of Winfield's transfer of the 9.93 percent interest to MDS because it refused to consent to all the provisions of the JDA.

When PennEnergy later that month issued a capital call for the three contract areas, Winfield tendered PennEnergy nearly $6.3 million (10 percent of the total working interest) while MDS tendered almost $6 million (9.93 percent of the total working interest). After accepting Winfield's tender but rejecting MDS's, PennEnergy informed Winfield that it was in default.

**B.**

With the dispute now clear, on March 9, 2018, MDS filed a two-count complaint against PennEnergy for tortious interference with contract and declaratory judgment in the Court of Common Pleas of Armstrong County.[2]

_____

[2] That case was captioned MDS ENERGY DEVELOPMENT, LLC, Plaintiff v. PENNENERGY RESOURCES, LLC, v. WINFIELD RESOURCES, LLS, Interested Party. In its complaint, MDS explained that Winfield was an interested party under Section 7540 of the Declaratory Judgments Act, which provides that "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." ***See*** Complaint, 3/9/18, ¶ 15 (R.

Ten days later, on March 19, 2018, PennEnergy submitted a demand for arbitration seeking declaratory relief against Winfield with the American Arbitration Association (AAA).

In response to the demand, MDS and Winfield both filed motions in Armstrong County to stay arbitration. PennEnergy, however, pointed out that both the JDA and APSA contain broad arbitration provisions requiring all contractual disputes be arbitrated.[3] Agreeing with PennEnergy, the Court of Common Pleas of Armstrong County denied the motions on April 4, 2018, finding that "an applicable agreement to arbitrate exists and governs the dispute," and that there was "nothing in the record indicating that all parties cannot participate in the already-initiated arbitration proceedings, as [MDS's] claims are based upon, and derivative of, the rights and obligations of the applicable agreement between [PennEnergy] and [Winfield.]"[4]

Accordingly, a few weeks later, on April 23, 2018, PennEnergy joined MDS as a respondent to its pending arbitration. After being joined, MDS filed

_____

433a). MDS brought another action against PennEnergy in the Court of Common Pleas of Butler County, No. 2020-10863, on behalf of another limited partnership, this time with the caption reading: MDS ENERGY DEVELOPMENT, LLC, as Managing General Partner for MDS 2018 - MARCELLUS SHALE DEVELOPMENT, LP, Plaintiff, v. PENNENERGY RESOURCES, LLC, Defendant. (R. 3802).

[3] While not a party to the JDA, MDS was a signatory of the APSA.

[4] *See* Order, 4/18/2018, at 1 (R. 466a).

- 6 -

its counterclaim in the arbitration. However, rather than seek both monetary damages for tortious interference and declaratory relief like it did in its state court action, MDS sought only declaratory relief that PennEnergy's interpretation of the JDA's transfer provisions were incorrect.

**C.**

In October 2018, MDS and Winfield rescinded their PSA. A month later, MDS moved to dismiss itself from the arbitration, arguing that rescission of the agreement had rendered moot any determination about its propriety. In so doing, MDS contended that it believed that its tortious interference claim remained pending in Armstrong County and was not referred to arbitration. If the arbitrator disagreed, however, MDS requested that it be granted leave to amend its counterclaim so that it could add its tortious interference claim. As will become relevant when addressing whether there was an arbitration agreement, PennEnergy opposed MDS's attempt to get out of the arbitration and reasserted the arguments it raised in opposition to MDS's and Winfield's motions to stay arbitration. On December 18, 2018, the arbitrator issued a procedural order denying MDS's motion to dismiss but granting it leave to amend its pleadings "so that the arbitrator can hear and decide its tortious interference claims and other claims urged against PennEnergy in the Pennsylvania state court."[5]

_____

[5] **_See_** Arbitrator's Procedural Order Five, 12/18/18, at 2 (R. 3950a).

In accordance with the arbitrator's order, on January 11, 2019, MDS amended its counterclaim to include the tortious interference claim against PennEnergy. In its claim, MDS alleged that PennEnergy improperly rejected its transfer with Winfield, causing it to suffer damages "in the tens of millions of dollars" because it missed out on tax deductions attributable to MDS's intangible drilling costs for the wells, lost opportunity costs and lost profits.[6]

**D.**

The four-day arbitration hearing was held in Pittsburgh in February 2019. At the hearing, MDS's principal, Michael Snyder, testified that MDS was suing on not only its own behalf but also MDS 2017 as its "representative" and "fiduciary." When asked why this representative status was not disclosed in MDS's claim, Snyder testified that he did not think it needed to be because MDS is a fiduciary for the limited partnership.

MDS also submitted its expert report of the damages that it was seeking for its tortious interference claim. In his report, MDS's expert described how Winfield, rather than receive cash, would have received units in MDS 2017 in consideration of transferring part of its working interest to MDS. In assessing the economic benefit that MDS would have received from the working interest, the expert relied on the financial model used by MDS in its communications with its limited partnership investors. In so doing, however, the expert

---

[6] **See** MDS's Amended Counterclaims, 1/11/19, at 14 (R. 225a).

clarified that he had not been asked to determine the amount of the economic benefit that should have been allocated between MDS, as the general partner, and MDS 2017, as the limited partnership. In total, the expert calculated a potential economic benefit between $9 million to $14 million that MDS would have received "but for" PennEnergy's rejection of the transfer.

In its post-hearing brief, PennEnergy argued that MDS lacked standing to recover for MDS 2017 since none of MDS's pleadings asserted that it was proceeding in a representative capacity for the limited partnership's benefit. While it did not dispute that MDS could bring a representative action as the managing general partner of MDS 2017, PennEnergy contended that MDS needed to include the limited partnership in the caption of its claim and disclose its representative status and the damages that it was seeking.

On May 14, 2019, the arbitrator issued his final award finding that PennEnergy wrongfully withheld approval of joinder in the JDA between Winfield and MDS. He did so because he did not accept PennEnergy's argument that § 6.2 of the JDA requires that the transferee (MDS) had to give its express agreement in writing to be bound by "all" of the terms of the JDA.[7]

_____

[7] The arbitrator found that §6.2 does not preclude all transfers without consent to all provisions of the JDA because "§ 6.1 grants Winfield the right to transfer all or any portion of its rights or obligations under this Agreement (the JDA), any of such Party's Participating Interest Share, the Joint Interests or any other rights or interests obtained or acquired hereunder. Clearly, under the plain and unambiguous language, Winfield could transfer all or any portion of its rights or obligations under the JDA. To interpret the intent of the parties

Consistent with that finding, the arbitrator further found that PennEnergy tortiously interfered with the PSA. While finding that Winfield itself suffered no damages, the arbitrator awarded MDS $2.4 million in damages after considering the range of damages identified in the expert reports. Relevant here, while not addressing PennEnergy's arguments about MDS appearing in a representative capacity for MDS 2017, the arbitrator identified MDS as the general partner for MDS 2017, the entity who had suffered damages.[8]

**E.**

On June 13, 2019, PennEnergy petitioned to vacate the arbitration award in the trial court, contesting only the arbitrator's award in favor of MDS for PennEnergy's tortious interference.[9] PennEnergy advanced several grounds for vacating the award, almost all of which related to MDS's

_____

as [PennEnergy] argues would create any inconsistency between the language of § 6.1 and § 6.2(b) as well as with the language found in the rest of the contract an arbitrator is not to construe language in one part of the contract to nullify or undermine another part of the contract." Final Award, 5/14/19, at 14 (R. 45a). Because "[t]he arbitrators are the final judges of both law and fact, their award [is] not … subject to reversal for a mistake of either." *Cargill v. Northwestern Nat. Ins. Co. of Milwaukee, Wis.*, 462 A.2d 833, 835 (Pa. Super. 1983) (citations omitted).

[8] *See* Final Award, 5/14/19, at 2 (R. 33a).

[9] MDS successfully moved to strike PennEnergy's petition because PennEnergy failed to attach a notice of presentment. PennEnergy appealed from the trial court's order but also filed and served an amended petition complying with the trial court's order. As a result, this Court later quashed PennEnergy's appeal. *See PennEnergy Resources, LLC v. Winfield Resources, LLC*, 1091 WDA 2019 (Pa. Super. June 26, 2020) (unpublished memorandum).

prosecution of the tortious interference claim in a representative capacity on behalf of MDS 2017. PennEnergy alleged that the arbitrator exceeded his powers by awarding MDS damages that were suffered by a third party, MDS 2017; that the arbitrator could not decide an issue between PennEnergy and MDS 2017 that was not part of any arbitration agreement; and that MDS 2017, as the real party in interest, needed to litigate its own claim.[10] In making these claims, PennEnergy did not dispute that MDS could litigate on MDS 2017's behalf as its managing general partnership, but if it wished to so, it needed to disclose that in the caption of its claim.[11]

PennEnergy also asserted that the arbitrator lacked jurisdiction to award any damages suffered by MDS 2017 because MDS and Winfield's February 2018 PSA—which is the agreement that PennEnergy was found to have interfered with—expressly disclaimed the limited partnership as a party or

_____

[10] Section 8620 of Pennsylvania's Uniform Limited Partnership Act provides, in relevant part, that "(a) Separate entity.--A limited partnership is an entity distinct from its partners. . . . (d) Powers.--A limited partnership has the capacity to sue and be sued in its own name and the power to do all things necessary or convenient to carry on its activities and affairs." 15 Pa.C.S. § 8620.

[11] In support for this contention, PennEnergy relied on Pennsylvania Rule of Civil Procedure 2002, which provides, in relevant part, that "all actions shall be prosecuted by and in the name of the real party in interest, without distinction between contracts under seal and parol contracts." Pa.R.Civ.P. 2002(a). Under the rule, when a plaintiff is "acting in a fiduciary or representative capacity," the plaintiff must disclose that capacity "in the caption and in the plaintiff's initial pleading[.]" Pa.R.Civ.P. 2002(b)(1).

intended beneficiary to the agreement.[12]  According to PennEnergy, to have standing to recover for tortious interference with contract, a plaintiff must be a party to the contract with which the defendant interfered or, in limited circumstances, the intended third-party beneficiary of that contract. Consequently, PennEnergy argued, the arbitrator exceeded his powers in awarding damages to MDS 2017 for a claim that it could not legally pursue.

Responding to these arguments, MDS asserted that PennEnergy "willfully ignores Pennsylvania precedent establishing that MDS, as managing general partner of MDS 2017, had standing to arbitrate its claim for tortious contractual interference against [PennEnergy] on behalf of MDS 2017."[13]  To that end, MDS disavowed PennEnergy's reliance on the Rules of Civil Procedure for arguing that it had to include its representative capacity in the caption of its state court civil action or arbitration counterclaim since arbitration proceedings are not governed by the Rules.  In any event, MDS continued, PennEnergy was aware several months before arbitration that MDS 2017 would ultimately receive the working interest.

---

[12] **See** PennEnergy's Omnibus Brief at 40-41 (R. 1619a-1620a).

[13] **See** MDS's Brief in Opposition to PennEnergy's Petition to Vacate Arbitration Award, 11/16/20, at 4 (R. 804a); **see also** at 16 (R. 816).

**F.**

On April 8, 2022, the trial court denied PennEnergy's petition and confirmed the arbitrator's award but acknowledged that the arbitrator's award bestowed $2.4 million in damages "to MDS 2017."  Trial Court Opinion (TCO), 4/8/22, at 1.  In its supporting opinion, the trial court first addressed PennEnergy's real party in interest claim, that is, whether MDS could represent MDS 2017 in a representative capacity as its managing general partner.  Finding that MDS could so, the trial court explained:

> In this case, MDS 2017-LP would be the real party in interest.  However, under Pennsylvania law, general partners of limited partnerships may sue on behalf of limited partnerships. "The rules establish that a 'partner' is an individual who bears unlimited liability for the partnership obligations and, as such, is authorized to prosecute and defend actions arising from the partnership's activities."  *In re Lawrence County Tax Claim Bureau*, 998 A.2d 675, 680 (Pa. Cmwlth. 2010).[14]  Further, "[p]artnerships are not recognized as separate entities like a corporation is; a limited partnership can only act through its designated agent (the general partner), and the general partner can be liable for the obligations of the limited partnership."  *Id.* at 679.  Therefore, MDS may litigate on behalf of MDS 2017-LP as the general partner of the limited partnership.

---

[14] In *Lawrence County*, the Commonwealth Court held that a general partner in a partnership had authority to represent the partnership *pro se* to stop a judicial sale of partnership property because the general partner could have been held liable for the rights and obligations of the partnership in his individual capacity.  *Lawrence Cty.*, 998 A.2d at 680.

TCO at 12 (case citation altered).[15]  Having so found, the trial court also agreed with MDS that it need not disclose its representative status in the caption of its claim because the Rules of Civil Procedure do not apply to arbitration proceedings.  *Id.* at 12-13.

The trial court next addressed PennEnergy's argument that MDS failed to disclose that it was acting in a representative capacity for MDS 2017.  On this point, the trial court found that MDS became aware of MDS 2017 at the very least before the arbitration hearing because it sought discovery into financial information about the limited partnership.  *Id.* at 5, n.2.  That being the case, the trial court found that MDS's failure to disclose that it was

---

[15] Section 8642 of Pennsylvania Uniform Limited Partnership Act of 2016 provides:

> (a) General rule.--Each general partner is an agent of the limited partnership for the purposes of its activities and affairs.  An act of a general partner, including the signing of a document in record form in the partnership's name, for apparently carrying on in the ordinary course the partnership's activities and affairs, or activities and affairs of the kind carried on by the partnership, binds the partnership, unless the general partner did not have authority to act for the partnership in the particular matter and the person with which the general partner was dealing knew or had notice that the general partner lacked authority.
>
> (b) Act outside of ordinary course.--An act of a general partner which is not apparently for carrying on in the ordinary course the limited partnership's activities and affairs, or activities and affairs of the kind carried on by the partnership, binds the partnership **only if the partner had actual authority to take the act**.

15 Pa.C.S. § 8642 (emphasis added).

proceeding in a representative capacity did not rise to the level of that needed to vacate an arbitrator's award.

> As noted above, the Court has determined that MDS may litigate on behalf of MDS 2017, acting as its general partner. Also noted above, PennEnergy knew of MDS 2017 before the arbitration hearing began; notably, when it attempted to conduct discovery into the "unnamed limited partnership." Frankly, [PennEnergy's] argument fails to reach the "unconscionable" and "unjust" standard. MDS is legally entitled to litigate on behalf of MDS 2017 and the fact that MDS 2017 was "not a named party" on the pleadings does not rise to the level of "unjust" or "unconscionable" that is required to vacate an arbitration award.

*Id.* at 16 (cleaned up).

The trial court likewise rejected PennEnergy's argument that the arbitrator exceeded his powers because he could not award damages for any loss suffered by MDS 2017 since it was not a third-party beneficiary under the PSA. *Id.* at 17-18. On this point, the trial court found that MDS 2017 was an assignee rather than a third-party beneficiary of the PSA because the agreement unambiguously stated that MDS "shall assign" the acquired interests to an MDS partnership developing the working interest. *Id.* at 18. As a result, because the assignee stands in the shoes of the assignor, then MDS 2017, as the intended assignee of the MDS's working interest, could sue a third party for tortious interference of a contract. *Id.* at 18-19. Thus, even though MDS 2017 was not named in the PSA, MDS as its general partner could sue on the limited partnership's behalf and the arbitrator did not exceed his powers. *Id.* at 19.

Finally, the trial court found that PennEnergy was judicially estopped from arguing that the arbitrator exceeded his authority because there was no agreement to arbitrate between itself and MDS 2017. *Id.* at 20. In so finding, the trial court noted that PennEnergy successfully opposed MDS's motion to dismiss itself from the arbitration since the arbitrator agreed with its position and kept MDS in the arbitration. *Id.*

After confirmation of the arbitrator's award, PennEnergy timely filed this appeal to argue the trial court erred in dismissing its petition to vacate the arbitrator's award.

## II.

In general, judicial review of arbitration awards is "extremely deferential." *Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 578 (3d Cir. 2005). Rather, mindful of the strong policy in favor of commercial arbitration, we begin with the presumption that the award is enforceable. We do not entertain claims that an arbitrator has made factual or legal errors. *McKenna v. Sosso*, 745 A.2d 1, 4-5 (Pa. Super. 1999). An arbitrator is also not required to provide a rationale for his or her decision or how it arrived at monetary damages. When parties agree to resolve their disputes before an arbitrator without involving the courts, the courts generally will enforce the bargains implicit in such agreements by enforcing arbitration awards whether there are clear errors of law or fact, and it is hard to discern

how the arbitrator arrived at the amount of money damages awarded. ***Hall St. Assocs., LLC v. Mattel, Inc.***, 552 U.S. 576, 584 (2008).

This does not mean, though, that an arbitration award is not subject to any judicial review. Section 7314(a)(1) of the Pennsylvania Uniform Arbitration Act (PUAA) states that an award can be vacated:[16]

> (1) On application of a party, the court shall vacate an award where:
>
> (i) the court would vacate the award under section 7341 (relating to common law arbitration) if this subchapter were not applicable;
>
> (ii) there was evident partiality by an arbitrator appointed as a neutral of corruption or misconduct in any of the arbitrators prejudicing the rights of any party;
>
> (iii) the arbitrators exceeded their powers;
>
> (iv) the arbitrators refused to postpone the hearing upon good cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 7307 (relating to hearing before arbitrators), as to prejudice substantially the rights of a party; or
>
> (v) there was no agreement to arbitrate and the issue of the existence of an agreement to arbitrate was not adversely determined in proceedings under section 7304 (relating to court proceedings to compel or stay arbitration) and the applicant-party raised the issue of the existence of an agreement to arbitrate at the hearing.

---

[16] While there was disagreement in the trial court, the parties appear to agree that PUAA provisions regarding vacating an arbitration award apply.

42 Pa.C.S. § 7314(a)(1).[17]

As can been seen, Section 7314(a)(1)(i) allows a statutory arbitration award to be vacated for the same reasons that a common law arbitration award can be vacated, which is when "it is clearly shown that a party was denied a hearing or that … other irregularity caused the rendition of an unjust, inequitable or unconscionable award."  ***See*** 42 Pa.C.S. §§ 7314(a)(1)(i) and 7341.[18]

---

[17] Our standard of review of the denial of a motion to vacate an arbitrator's award is well-settled:  "we will reverse a trial court's decision regarding whether to vacate an arbitration award only for an abuse of discretion or error of law."  ***Joseph v. Advest, Inc.***, 906 A.2d 1205, 1208 (Pa. Super. 2006) (citing ***Conner v. Daimler Chrysler Corp.***, 820 A.2d 1266, 1269 (Pa. Super. 2003)).  In other words, on a motion to confirm or vacate an arbitration award, we review the trial court's legal conclusions *de novo* and its factual findings for clear error.  The threshold question of whether agreement to arbitrate exists is one which the lower court, and reviewing courts, has the authority to adjudicate.  ***Patton v. Hanover Ins. Co.***, 612 A.2d 517, 520 (Pa. Super. 1992) (citation omitted).

[18] "Irregularity refers to the process employed in reaching the result of the arbitration, not the result itself."  ***Gargano v. Terminix Int'l Co., L.P.***, 748 A.2d 188, 193 (Pa. Super. 2001).  Moreover, the irregularity must "import [] 'such bad faith, ignorance of the law [,] and indifference to the justice of the result' as would cause a court to vacate an arbitration award."  ***F.J. Busse Co. v. Zipporah, L.P***., 879 A.2d 809, 811 (Pa. Super. 2005) (citation omitted).  "Notice and the opportunity to be heard are essential elements of a fair hearing.  Litigants require not simply notice that a hearing is to occur, but also notice of the issues to be litigated.  A principal function of pleadings, even in their shortened, modern form, is to focus the litigants' attention on the issues so that they may marshal their evidence and prepare their arguments."  ***Mellon v. Travelers Inc. Co.***, 406 A.2d 759, 762 (Pa. Super. 1979).

**A.**

On appeal, PennEnergy argues, among other things, that the arbitrator was without jurisdiction and exceeded his authority by awarding damages incurred by MDS 2017 because it was not a party to the arbitration and did not seek to be joined in the arbitration. PennEnergy also argues that its due process rights were violated because, until the arbitration hearing, MDS never disclosed that it was acting on behalf and seeking damages for MDS 2017. For its part, MDS contends that as the managing general partner of MDS 2017, it had the right to litigate on the limited partnership's behalf, and that PennEnergy knew before the hearing that MDS 2017 was the tax vehicle to which MDS would convey its interest. MDS also asserts that PennEnergy is judicially estopped from arguing that there was no arbitration agreement because it opposed MDS's motion to dismiss itself from the arbitration.

Under the PUAA, the arbitrator's award can be vacated if an arbitrator "exceed[s] [his] powers" or determines issues when "there was no agreement to arbitrate," 42 Pa.C.S. §7314(a)(1)(iii) & (v), or when he awards damages for injuries sustained by a third party not subject to an arbitration agreement or joined as a party to the arbitration. *See*, *e.g.*, ***Civan v. Windermere Farms, Inc.***, 180 A.3d 489, 499 (Pa. Super. Ct. 2018) ("the arbitration panel exceeded its power by determining that the panel had jurisdiction over the contractor, the contractor never agreed to arbitrate disputes arising out of the

agreement of sale, and the buyers failed to obtain an order compelling the contractor to arbitrate.").

Moreover, an arbitrator's decision can be vacated when an arbitrator makes an award for claims that were never raised by or against parties that are not named in the arbitration. *See*, *e.g.*, *Mellon*, 406 A.2d at 762; *Alaia v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 A.2d 273, 277 (Pa. Super. 2007). *See also Eljer Mfg. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1256 (7th Cir. 1994) ("Though the arbitration clause is broadly worded, it cannot be construed to delegate to the arbitrator the power to arbitrate disputes between [plaintiff] and a third party."); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 848 (6th Cir. 2003) (holding arbitration panel exceeds its authority when it mandates payment to a non-party).

Central to all PennEnergy's issues is whether MDS 2017 was a party to the litigation because MDS was a party and it served as the managing general partner of MDS 2017. MDS first became involved in the litigation when it brought its action in the Court of Common Pleas of Armstrong County against PennEnergy for tortious interference based on wrongfully withholding approval of the notice of its joinder in the PSA sought by Winfield. As noted, the Court of Common Pleas of Armstrong County ordered that the case be referred to arbitration because MDS's rights were "based upon, and derivative of, the rights and obligations" of Winfield's under the JDA. Unlike the Butler County case note above, *see infra* n.2, MDS made no mention in its Armstrong

County action that it was also seeking damages on MDS 2017's behalf as its managing general partner. Because MDS did not do so, PennEnergy joined only MDS as a party to the arbitration after the Court of Common Pleas of Armstrong County referred its action to the pending arbitration. After PennEnergy did so, MDS did not respond to the joinder that it was also acting as the general partner of MDS 2017.

As discussed, MDS filed its counterclaim after being joined but sought only declaratory relief, as it believed that its tortious interference claim was not referred to arbitration. It was not until its motion to dismiss was denied that it counterclaimed for tortious interference only a month before the arbitration. Again, when it finally filed its counterclaim for tortious interference in the arbitration, MDS made no mention of MDS 2017 or that it was pursing the claim in a representative capacity on the limited partnership's behalf. By failing to so, PennEnergy claims, it did not become aware that MDS was seeking damages until the time of the arbitration hearing.

Notwithstanding that it was never named or mentioned in the pleadings before the Court of Common Pleas of Armstrong County or in MDS's counterclaim, or that MDS was bringing this action as the general partner, the arbitrator awarded damages to MDS as the general partner of MDS 2017. The arbitrator seems to have accepted Snyder's argument that MDS did not have to disclose that it was not only seeking damages on its own behalf but also on behalf of MDS 2017 as its "representative" and "fiduciary." The trial court also

accepted that MDS 2017 does not have to be named because general partners can bring actions on behalf of the limited partnership, and MDS was MDS 2017's managing general partner making it a party to the action.

While general partners can bring an action on behalf of a limited partnership, that does not mean that any time a party sues that it is also suing on behalf of any limited partnership that it happens to be a general partner. A limited partnership "is an entity distinct from its partner" and has the "capacity to sue and be sued in its own name." 15 Pa.C.S. § 8620. Because the limited partnership is a distinct entity, for a general partner to bring an action on behalf of the limited partnership, it is required to do so in the name of the limited partnership. *See* Pa.R.Civ.P. 2002(b)(1) ("A plaintiff may sue in his or her own name without joining as plaintiff or use-plaintiff any person beneficially interested when such plaintiff … is acting in a fiduciary or representative capacity, which capacity is disclosed in the caption and in the plaintiff's initial pleading."). A party defending the claim should be on notice who is seeking damages.

Notice and the opportunity to be heard are essential elements of a fair hearing. As the trial court noted, under Pennsylvania Rules of Civil Procedure, requiring the party to be named in the caption does not apply to arbitration proceedings. What those Rules ensure, however, is that a party's due process rights are protected by giving that party notice of the issues so that they may marshal their evidence and prepare their arguments. *See Mellon v.*

*Travelers Inc. Co.*, 406 A.2d 759, 762 (Pa. Super. 1979).[19]   For similar reasons, under 42 Pa.C.S. §7314(a)(1), courts may vacate an award when a party's due process rights are violated or when a hearing is not fair because a party is deprived of knowing who the party is for which damages are being sought.

In this case, no one is contending that MDS 2017 brought the action in its own name.  What is being contended by MDS is that it brought this action not only on its behalf but as general partner of MDS 2017, even if it did not disclose that that is what it is doing.  However, ignoring whether MDS 2017 could be a party to the arbitration even if notice were given, PennEnergy did not receive the requisite notice that MDS was suing on behalf of MDS 2017 or that MDS was seeking damages on MDS 2017's behalf until the arbitration began and to which it objected.  Basic due process demands that notice be given as to who is the party bringing the action and on whose behalf and what damages are being sought.  In other words, who has "skin in the game."

Contrary to Snyder's testimony that it did not need to disclose that MDS was not only seeking damages on its own behalf but also on behalf of MDS 2017 as its "representative" and "fiduciary," when an entity that is a general

---

[19] We also note that Rule R-4(e) of the AAA Commercial Arbitration Rules provides that "Information to be included with any arbitration filing includes: (i). the name of each party; … [and] (iv). a statement setting forth the nature of the claim including the relief sought and the amount involved[.]"  AAA Commercial Rules R-4(e)(i) & (iv).

partner of a limited partnership is part of an arbitration does not mean that the limited partnership automatically becomes a party to litigation.[20] Because PennEnergy did not receive direct notice that MDS was acting as general partner for MDS 2017 in the arbitration, the arbitration proceeding violated PennEnergy's due process rights to a fair hearing and, likewise, the arbitrator lacked jurisdiction to hear the matter and exceeded his authority in awarding damages to MDS 2017 because it was not a party to the action.

**B.**

That does not end the matter because, even if all that is true, MDS contends that PennEnergy was aware or should have known that it was bringing the action in a representative capacity on behalf of MDS 2017. To begin, we note that such notice does not satisfy due process because there is an affirmative duty on the part of a party seeking to hold another party for

---

[20] Yet this is what the trial court seems to hold in rejecting PennEnergy's complaints about MDS not disclosing its representative status. In support, the trial court cited our Commonwealth Court's decision in **Lawrence County** for the proposition that a managing general partner and its limited partnership can be treated interchangeably. As noted above, see infra n.14, in **Lawrence County**, the Commonwealth Court merely allowed an individual general partner of a limited partnership can personally appear and represent the partnership pro se in legal actions. **Lawrence Cty.**, 998 A.2d at 680. As the Commonwealth Court later clarified, Lawrence County did not hold that a limited partnership is "legally interchangeable" with its individual partners. **See Jamestown Condominium v. Sofavoy**, 2019 WL 2401318, * 2 (Pa. Cmwlth. May 3, 2019) (unpublished memorandum).

damages, even under the AAA Rules, to name that party and the claim it is asserting against that party before it makes it obligated to pay damages.

MDS's position also benefits from its own failure to give direct notice that it was bringing the action as the general partner of MDS 2017. If MDS would have given such notice, then PennEnergy could have opposed MDS 2017's participation because there was no agreement and MDS did not have any rights to recover any damages under the dispute being arbitrated. (**See** Part III of this Opinion). In any event, there is nothing that establishes that PennEnergy indirectly knew that MDS was acting on behalf of MDS 2017 before the arbitration hearing.

First, MDS claims that "Michael Snyder made clear that the tortious interference claims were being litigated on behalf of both MDS and MDS 2017, with MDS, the managing general partner of the MDS 2017 limited partnership, acting as representative and fiduciary for MDS 2017. (R. 23a; R. 1468a; (3038a; 3078-79a)." MDS's Brief at 9. That argument is somewhat misleading. While Snyder did testify that he was suing on behalf of MDS 2017, he only made those statements in his testimony at the arbitration hearing where he testified that he did not think that he had to disclose that MDS was seeking damages on MDS 2017's behalf. The other citations refer to his

deposition testimony that was taken after the arbitration hearing as part of PennEnergy's motion to vacate the arbitration award.[21]

The only direct evidence that MDS can point to that PennEnergy had any notice that it was bringing this action as MDS's general partner was in its pre-hearing brief it filed shortly before the hearing. In its pre-hearing brief, MDS asserted:

> PennEnergy's misconduct, having no discernible business purpose and seemingly undertaken out of spite for Winfield's principal— Michael Snyder's father—and MDS, damaged MDS (both itself and as representative for [MDS 2017], on whose behalf MDS acquired the interests) in the term of millions of dollars.

MDS's Pre-Hearing Brief at 2 (R. 1128a). Even though it never mentioned MDS 2017 in its amended counterclaim, MDS claimed that this one sentence among many shows that PennEnergy was put on notice that MDS brought the tortious interference claim on behalf of itself and as a representative for MDS

_____

[21] The first citation, R. 23a, cites PennEnergy's petition to vacate where it recounts that Snyder stated for the first time at the arbitration hearing that MDS was operating in a representative capacity. The citation at R. 1468a is from the arbitration hearing where he admitted that MDS's counterclaim did not disclose that MDS was suing as a fiduciary and representative on behalf of MDS 2017, and stated that he did not think that MDS had to disclose its representative capacity. The citations, meanwhile, at R. 3038a and R. 3078-79a, are from Snyder's April 20, 2021 deposition taken in conjunction with PennEnergy's petition to vacate. His testimony at R. 3038a merely states that MDS is the general partner of MDS 2017, that it has no officers or employees and that it was never mentioned in the pleadings. At R. 3078-79a, Snyder merely reiterates his testimony at the arbitration hearing that MDS was under no obligation to disclose its representative capacity before the arbitration hearing that it was also suing as MDS 2017.

2017. Slipping a statement into a pre-hearing brief, however, does not amend the pleadings or put a party, presuming that even if it were read, on legal notice that a party is being added or the claim is being amended; it is the same as springing the issue at the arbitration hearing.

A pre-hearing brief addressing the party's position cannot add new parties or advance new claims in the proceeding. Rather, formal notice is required. Arbitration rules are loose, but not that loose; otherwise, the rules themselves would violate due process. In any event, Penn Energy objected to inclusion of this claim at the hearing, the first opportunity that it had, that it did not have fair notice that MDS was bringing this action on behalf of MDS 2017.

Second, MDS claims that even if PennEnergy did not have direct notice, it knew or should have known that MDS was bringing this action because depositions, pre-hearing briefs and expert damages reports made PennEnergy aware of the damages that MDS was asserting tortious interference claims both for itself and as representative for MDS 2017. In support of this argument, MDS cites:

- A September 2018 deposition of Winfield's principal, David Snyder, where PennEnergy's counsel asked whether it was correct that "MDS Energy Development LLC would assign the interest it acquired from Winfield to this 2017 MDS limited partnership." Mr. Snyder responded that it was. (R. 1125a).

- In September 2018 when PennEnergy deposed Michael Snyder and questioned him at length about MDS's role as the managing general partner of limited drilling partnerships. Mr.

Snyder explained how investors directly invested into the MDS limited partnership. (R. 1125-26a).

- A December 2018 pre-arbitration hearing brief where PennEnergy itself described the MDS claim as tortious interference with the agreement "**by which MDS would acquire its share and Winfield would become a unit-holder in an MOS-affiliated investment partnership**." (R. 1126-27a, emphasis in original).

- In a pre-hearing submission, PennEnergy asserted that MDS had "divulged that the transaction required a further transfer of the Winfield Participating Interest Share to **an MDS-related investment partnership**, and Winfield would receive units in that partnership, but no cash." (R. 1127a, emphasis supplied).

- MDS's pre-hearing expert damages report clearly stated that, in place of cash, Winfield would receive units in MDS 2017 in consideration of the transfer of the 9.93 percent working interest from Winfield to MDS. (R. 1127a). The MDS expert did not allocate the economic benefits to derive from the working interest among MDS, MDS 2017 and other entities. (R. 1127-28a).

Again, indirect notice does not satisfy the due process requirement and a party's obligation to give a party notice of who is seeking redress. In any event, none of those above actions would put PennEnergy on notice that MDS was bringing an action on behalf of MDS 2017. PennEnergy was not required to divine in what capacities MDS was acting when MDS did not say for whom it was acting. MDS also asserts that PennEnergy was aware of the damages that MDS asserted, both for itself and as representative for MDS 2017, because it sought more discovery into the identities of the hundreds of investors in MDS 2017, (R. 1128a) which MDS opposed. Even when responding to PennEnergy's request merely weeks before the arbitration hearing, MDS never stated that it was acting as the general partner for MDS

2017, which may have led to a different outcome on whether the discovery request was granted.[22]

## C.

PennEnergy also contends that the trial court erred when it held that Penn Energy was "judicially estopped" from arguing that it had no arbitration agreement with MDS 2017. Judicial estoppel applies only when a party takes an inconsistent position that a court relies on to resolve a disputed issue. ***See***, ***e.g.***, ***Trowbridge v. Scranton Artificial Limb Co.***, 747 A.2d 862, 864 (Pa. 2000) (requiring that a party assume an inconsistent position that was "successfully maintained").[23] As a result, the trial court never addressed

---

[22] In the Butler County case referred to in footnote 2, MDS 2018 had 698 general partners. Section 8646(a) of the Uniform Limited Partnership Act provides: "General rule.--Each general partner has equal rights in the management and conduct of the limited partnership's activities and affairs. Except as provided in this title, any matter relating to the activities and affairs of the partnership is decided exclusively by the general partner or, if there is more than one general partner, **by a majority of the general partners**." 15 Pa. C.S. § 8646(a) (emphasis added).

[23] ***In re Adoption of S.A.J.***, 838 A.2d 616, Pa. 2003), our Supreme Court stated: "the purpose of judicial estoppel is to uphold the integrity of the courts by 'preventing parties from abusing the judicial process by changing positions as the moment requires.'" ***Id.*** at 621 (quoting ***Trowbridge***, 747 A.2d at 865). In ***Tops Apparel Mfg. Co. v. Rothman***, 244 A.2d 436 (Pa. 1968), our Supreme Court stated that "[a]dmissions ... contained in pleadings, stipulations, and the like are usually termed 'judicial admissions' and as such cannot be later contradicted by the party who made them." ***Id.*** at 438 (internal footnote omitted). In ***Tops***, we noted our longstanding reliance on this principle and stated that "[w]hen a man alleges a fact in a court of justice, for his advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in the administration of

PennEnergy's contention that it did not have an agreement to arbitrate MDS 2017's claims.

The trial court invoked judicial estoppel solely based on a statement in PennEnergy's brief in opposition to MDS's November 28, 2018 motion to dismiss itself from the arbitration. In that brief, PennEnergy stated:

> … Further, under Pennsylvania law, when a party, such as MDS, claims a right or a benefit under an agreement even though it is not a signatory to that agreement, it may nevertheless be compelled to arbitrate a dispute, particularly where the facts of the matter are "inexplicably intertwined," with claims already subject to arbitration. …

PennEnergy's Brief in Opposition to MDS's Motion to Dismiss, 12/12/18, at 9-10 (R. 4663a-4664a).

The trial court took that statement to mean that when PennEnergy opposed MDS's motion to dismiss itself from the arbitration, it was somehow also opposing MDS 2017's dismissal from the action. As a result, the trial court concluded that it was judicially estopped from contending that it did not have an agreement to arbitrate with MDS 2017.

However, when PennEnergy filed its brief opposing MDS's attempt to get

---

justice." ***Id.*** at 438, n. 8 (citing ***Wills v. Kane***, 2 Grant 60, 63 (Pa. 1853)). "Federal courts have long applied this principle of estoppel where litigants play 'fast and loose' with the courts by switching legal positions to suit their own ends." ***Trowbridge***, 747 A.2d at 865 (quoting ***Ligon v. Middletown Area School District***, 136 Pa. Cmwlth. 566, 584 A.2d 376, 380 (1990)). We note, without taking a position, that it did not include briefs as one of the submissions for which judicial estoppel applied.

out of the arbitration, PennEnergy did not know that MDS was also bringing the action on behalf of MDS 2017. As can be seen, the cited passage from PennEnergy's 2018 opposition brief refers only to MDS and makes no mention of MDS 2017, which is unsurprising, since it did not yet know that MDS was litigating the tortious interference claim on behalf of MDS 2017.

Because it was unaware that MDS was bringing the action as general partner of MDS 2017, we do not see how that statement in PennEnergy's brief opposing MDS's motion to dismiss itself from the action contradicts its position now that MDS 2017 did not have an arbitration agreement with PennEnergy. Simply, judicial estoppel does not apply because PennEnergy took no position on MDS 2017's participation because it did know that MDS was in the future going to allege that it was acting both for itself and as MDS 2017's general partner in the arbitration proceeding. *Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Fam. Mkt., Inc.*, 98 A.2d 645, 656 (Pa. Super. 2014) (rejecting application of judicial estoppel where no inconsistent position existed).

That then leaves the question whether the arbitrator's award should be vacated because "there was no agreement to arbitrate" between PennEnergy and MDS 2017. *See* 42 Pa.C.S. § 7314(a)(5).

> Whether a claim is within the scope of an arbitration provision is a matter of contract, and as with all questions of law, our review of the trial court's conclusion is plenary. "The scope of arbitration is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally. These are questions of law and our review is plenary."

> Arbitration is a matter of contract, and parties to a contract cannot be compelled to arbitrate a given issue absent an agreement between them to arbitrate that issue. Even though it is now the policy of the law to favor settlement of disputes by arbitration and to promote the swift and orderly disposition of claims, arbitration agreements are to be strictly construed and such agreements should not be extended by implication.

**Elwyn v. DeLuca**, 48 A.3d 457, 461 (Pa. Super. 2012) (citations omitted).

To begin with, there is no dispute that MDS could arbitrate its contractual claim against it because both parties were signatories of the APSA, which, as noted, contained a broad arbitration clause. Likewise, there can also be no dispute that PennEnergy and MDS 2017—which is a distinct entity from its partners and has the capacity to sue and be sued in its own name— do not have an arbitration agreement. Indeed, if MDS 2017 sought to pursue a tortious interference claim against PennEnergy in its own name, it would not be able to pursue that claim through arbitration proceedings. We are not aware, however, of any authority for the proposition that MDS seeks to advance, namely, that a general partner can arbitrate a contractual claim against another party in a representative capacity for a limited partnership even though that limited partnership and the other party do not have an arbitration agreement.

In the absence of such authority, we are constrained to apply our established precedent that arbitration agreements should not be extended by implication, which, in this case, means that PennEnergy and MDS's arbitration agreement in the 2012 APSA cannot be extended as providing for future

representative actions by one party for the benefit of an as-yet-created limited partnership. If we were to hold the opposite, then a general partnership could always secure an arbitral forum for a limited partnership's claims even if that limited partnership did not have an arbitration agreement with the party from which it sought recovery. Again, we hold that the trial court erred in not vacating the arbitrator's award because "there was no agreement to arbitrate" between PennEnergy and the real party in interest, MDS 2017.

**D.**

Accordingly, to summarize thus far, the arbitrator's award must be vacated under Section 7314(a)(1) of the PUAA because the proceeding was "irregular" since PennEnergy did not receive notice that MDS was bringing this action as MDS 2017's general partner; there was no agreement to submit to arbitration any claims by MDS 2017; and the arbitrator exceeded his authority by addressing a claim over which he had no jurisdiction to arbitrate.

**III.**

Even assuming that requisite notice was given by MDS that it was also bringing the tortious interference claim as the general partner of MDS 2017, the award must still be vacated because the arbitrator did not have jurisdiction and/or exceeded his authority by awarding damages incurred by MDS 2017. It lacked jurisdiction because PennEnergy never agreed to arbitrate any claim for tortious interference damages sought by MDS 2017, as well as because

MDS-2017 did not have rights in any February 2018 PSA between MDS and Winfield that subjected PennEnergy to arbitration.

In this case, the contractual obligation that PennEnergy was deemed to have breached under its JDA with Winfield was whether it wrongfully withheld approval of the joinder of MDS to succeed to some of Winfield's contractual interests in that agreement. After PennEnergy's refusal to approve joinder, MDS and Winfield still decided to execute the February 2018 PSA that provided for MDS's interests to be conveyed to an unnamed MDS limited partnership, later identified outside of that agreement as MDS 2017. The damages the arbitrator awarded were not incurred by Winfield or MDS but for losses purportedly incurred by MDS 2017.

Arbitrators only have jurisdiction over claims and damages which the parties agreed to arbitrate. Ignoring that only MDS was made a party to the arbitration by the Court of Common Pleas of Armstrong County, only MDS was joined in the arbitration, and that MDS 2017 was not even named in the February 2018 PSA, the arbitrator might have had jurisdiction to award damages if MDS 2017 any rights under the February 18, 2018 PSA if proper notice had been given. Though not a party to the PSA, MDS may have been able to bring the tortious interference claim where it was treated as a third-party beneficiary to the PSA.

As we have explained:

Our Supreme Court adopted the Restatement (Second) of Torts § 766 in **Adler, Barish, Daniels, Levin and Creskoff v.**

> ***Epstein***, 482 Pa. 416, 393 A.2d 1175, 1182 (1978).  Section 766 of the Restatement defines the tort of intentional interference with existing contractual relations and provides:
>
> > One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
>
> > Rest. (2d) of Torts § 766.

***Salsberg v. Mann***, 262 A.3d 1267, 1270 (Pa. Super. 2021), *appeal granted*, 275 A.3d 964 (Pa. 2022).

To prevail on a claim for intentional interference with a contract, a plaintiff is required to prove, by a preponderance of the evidence, four elements:  (1) the existence of a contractual relationship between the complainant and a third party; (2) the purposeful action on the part of the defendant intended to harm the existing relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) actual harm to the complainant as a result of the defendant's conduct.  ***See Maverick Steel Co. v. Dick Corp./Barton Malow***, 54 A.3d 352, 354-55 (Pa. Super. 2012).

Under the first element of the tort, the plaintiff must be a party to the contract or a third part beneficiary.

> In order for a third party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself. ***Scarpitti v. Weborg***, 609 A.2d 147, 149 (Pa. 1992).  Furthermore,

> to be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by **one** of the parties to the contract and the **third person** that the latter should be a beneficiary, but **both parties to the contract** must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking.

***Kirschner v. K & L Gates LLP***, 46 A.3d 737, 762 (Pa. Super. 2012) (quoting ***Spires v. Hanover Fire Ins. Co.***, 364 Pa. 52, 70 A.2d 828, 830–31 (1950) (emphases in original), *overruled in part by,* ***Guy v. Liederbach***, 459 A.2d 744 (Pa. 1983)) (parallel citations omitted).

While parties are free to explicitly state that a contract provision is intended to create third-party beneficiary rights and identify, by name, the holder of those rights, we also note that "[p]arties may explicitly state that a contract is *not* intended to create third-party beneficiary rights or identify the specific persons who do not hold these rights, as noted in Section 302(1) of the Restatement (Second) of Contracts." ***McGaffic v. City of New Castle***, 74 A.3d 306, 312 (Pa. Cmwlth. 2013).

Here, MDS 2017, through MDS prosecuting as its general partner prosecuting the claim, did not have any rights under the PSA because that agreement explicitly disclaimed that the limited partnership, later identified as MDS 2017, was a third-party beneficiary under the agreement. That provision reads in full as follows:

> No Third Party Beneficiary. Only the Parties hereto, their respective successors and permitted assigns are intended to benefit from this Agreement and no other Party, **including the Limited Partnership**, is intended to be a beneficiary hereof. (Emphasis added.)

PSA, ¶ 5(d) (R. 381a). The agreement defines the "limited partnership" as "the MDS partnership development developing said working interest," which would be MDS 2017. *Id.* ¶ 3 (R. 380a). Under the express term of MDS and Winfield's agreement then, the unnamed limited partnership, later denominated MDS 2017, was not a party or an intended third-party beneficiary of the contract with which damages that PennEnergy was alleged to have tortiously interfered.

Even if proper notice that MDS were purportedly prosecuting the tortious interference claim as its general partner, MDS 2017 has no rights in that agreement or standing to recover on MDS and Winfield's agreement as a third-party beneficiary. That agreement expressly stated that there would be no third-party beneficiaries under the agreement. In so stating, MDS and Winfield expressly provided that the MDS limited partnership, which was ultimately intended to be MDS 2017, was not an intended beneficiary. Thus, even though the agreement contemplated that Winfield would be paid in the form of units in MDS 2017, the agreement still explicitly disclaimed that there was any intent to make MDS 2017 a beneficiary. Consequently, because it was neither a contracting party nor an intended third-party beneficiary, MDS

2017 would be unable to recover against PennEnergy for tortiously interfering with MDS and Winfield's agreement.

As discussed, the trial court found PennEnergy's claim unavailing because, as PennEnergy itself acknowledged in its petition to vacate, MDS was required under the agreement to assign its acquired interest to a limited partnership. That provision provided, in relevant part:

> (b) [MDS] shall assign the Acquired Interests to the Limited Partnership pursuant to a form of assignment instrument that is reasonably satisfactory to [Winfield], which form of assignment instrument shall reference this unrecorded Agreement to the effect that [Winfield] has certain rights, as provided, with respect to the granting of such assignment and the re-assignment of the Acquired Interests.

PSA, ¶ 3(b) (R. 381a).

Besides there being no evidence that MDS ever executed such an assignment, even if one had occurred, that would not provide the arbitrator with authority to arbitrate a claim with a party and claim that PennEnergy did not agree to arbitrate.

In any event, the trial court's interpretation of the contract elevates this paragraph over the provision expressly disclaiming that the limited partnership, MDS 2017, is not a third-party beneficiary. As PennEnergy highlights,

> It is well-settled that clauses in a contract should not be read as independent agreements thrown together without consideration of their combined effects. Terms in one section of the contract, therefore, should never be interpreted in a manner which nullifies other terms in the same agreement. Furthermore, **the specific controls the general when interpreting a contract**.

*Trombetta v. Raymond James Fin. Services, Inc.,* 907 A.2d 550, 560 (Pa. Super. 2006) (citations omitted) (emphasis added).  Indeed, "[i]t is fundamental that one part of a contract cannot be so interpreted as to annul another part and that writings which comprise an agreement must be interpreted as a whole." *Southwestern Energy Prod. Co. v. Forest Res., LLC*, 83 A.3d 177, 187 (Pa. Super. 2013) (citation omitted).

Again, MDS and Winfield included a provision in their agreement addressing third-party beneficiaries and expressly provided that no other party, including the MDS limited partnership, was a third party beneficiary of the agreement.  However, by finding that MDS 2017 was an assignee of MDS's rights to the PSA, of which there was no proof of an assignment, the trial court effectively read the provision providing for MDS 2017's eventual assignment as annulling MDS and Winfield's unambiguous provision specifically disclaiming the limited partnership as a beneficiary.  Applying the above principles, we cannot agree with this reading, as it essentially reads the provision for no third-party beneficiaries out of the contract.

Accordingly, for all these reasons, we vacate the trial court's order confirming the arbitration award and remand with instructions to vacate the

arbitrator's award limited to paragraph five of the arbitrator's May 14, 2019 final award.[24]

Order reversed and remanded with instructions. Jurisdiction relinquished.

Judge Olson joins the Opinion.

Judge Nichols concurs in the result.


Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/25/2023

---

[24] Because we have vacated the award for the aforesaid reasons, we need not address PennEnergy's additional claim that damages could not be recovered because its conduct amounted to a good faith dispute over contract terms.