2024 PA Super 219

| | | |
|---|---|---|
| PENNENERGY RESOURCES, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MDS ENERGY DEVELOPMENT, LLC., AND MDS 2018 - MARCELLUS SHALE DEVELOPMENT, LP. | : | No. 132 WDA 2023 |
| | : | |
| Appellants | : | |

Appeal from the Order Entered January 12, 2023
In the Court of Common Pleas of Butler County Civil Division at No(s):
No. 22-10724

BEFORE: BOWES, J., OLSON, J., and KING, J.

OPINION BY OLSON, J.: **FILED: SEPTEMBER 20, 2024**

Appellants, MDS Energy Development, LLC ("MDS" or "Appellant MDS") and MDS 2018 – Marcellus Shale Development, LP ("MDS-2018" or "Appellant MDS-2018"), appeal from the order entered on January 12, 2023, which granted the Motion for Preliminary Injunction or Other Special Relief to Stay Arbitration filed on behalf of Plaintiff PennEnergy Resources, LLC ("PennEnergy"). PennEnergy requested injunctive relief to preclude MDS and MDS-2018 from pursuing arbitration of breach of contract claims those entities sought to assert against PennEnergy. We affirm in part and vacate in part.

On July 12, 2012, PennEnergy entered into a Joint Development Agreement ("JDA") with natural gas producer Winfield Resources, LLC ("Winfield"). *See* JDA, 7/12/12, at 1. Under the JDA, PennEnergy and

Winfield agreed to work together to explore and develop certain natural gas leaseholds within a defined area of mutual interest ("AMI"), located in Butler and Armstrong counties. ***See id.***

The JDA contains a broad dispute resolution and arbitration provision, which declares:

> [a]ny dispute, claim or controversy arising out of or relating to this Agreement, including the negotiation, formation, validity, enforceability, interpretation, application, performance, breach, enforcement or termination of this Agreement . . . whether sounding in contract, tort, statute, equity or otherwise . . . shall be resolved in accordance with the [following] procedures . . . which shall be the sole and exclusive procedures for the resolution of any Dispute.
>
> (a) The Parties shall attempt to resolve any Dispute promptly by negotiation between representatives who have authority to settle the controversy. Either Party may give the other Party written notice (a "Dispute Notice") of any Dispute not resolved in the normal course of business. Within 20 days after a Dispute Notice is given, . . . senior executives of the Parties shall meet in person and use their good faith and reasonable efforts to attempt to resolve the Dispute. . . .
>
> (b) If the Dispute has not been resolved by negotiations within 30 days after the Dispute Notice Date, either Party may submit it to binding arbitration in accordance with the Commercial Arbitration Rules then in effect . . . of the American Arbitration Association (the "AAA"), except as otherwise provided herein. . . .
>
> . . .
>
> (f) The arbitration shall proceed under the AAA Rules, except to the extent modified by this Agreement, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1, *et seq.* . . .

*Id.* at § 11.10 (emphasis omitted).  Section 9.1 of the JDA declares that the above-quoted dispute resolution and arbitration provision "shall survive termination of" the JDA.  *See id.* at ¶ 9.1.

The JDA further declares that "nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not party to this Agreement."  *Id.* at § 11.7.  Nevertheless, as stated in the JDA, Winfield acquired authorization to transfer "all or any portion of its rights or obligations under [the JDA], any of [Winfield's] Participating Interest Share, the Joint Interests or any other rights or interests obtained or acquired hereunder."  *Id.* at § 6.1.  The JDA declares that any such transfer shall be effective against PennEnergy "as of the first business day of the calendar month immediately following" PennEnergy's receipt of:  1) proper notice and 2) the transferee's express agreement, in writing, declaring that the transferee will be "bound by all of the terms and conditions of" the JDA and the applicable operating agreements.  *See id.* at § 6.2.

On November 27, 2018, MDS and Winfield entered into a Purchase and Sale Agreement where Winfield sold, and MDS purchased, Winfield's Working Interest in certain, specific wellbores that are located in Contract Areas W-45 and W-71 of the AMI, thus transferring the Working Interest in the wellbores from Winfield's Participating Interest Share to MDS.[1]  *See* Purchase and Sale

_____

[1] Under the JDA, the term "Working Interest" means "a Party's interest in the full and entire leasehold estate in any Lease and all rights and obligations of
*(Footnote Continued Next Page)*

Agreement, 11/27/18, at 1. That same day, MDS and Winfield executed a "Notice of Joinder" to the JDA, declaring: "MDS hereby agrees to be bound by the terms of the JDA and that certain Operating Agreement dated as of July 19, 2013 by and between [PennEnergy] and Winfield . . . specifically as it relates to and limited to [certain identified wellbores] all within the [W-45 and W-71 Contract Areas]." *See* Notice of Joinder, 11/27/18, at 1. "MDS and Winfield mailed an executed Notice of Joinder to PennEnergy on November 27, 2018." *See* MDS's Preliminary Objections and Petition to Compel Arbitration, 10/5/22, at 4.

On December 21, 2018, PennEnergy notified Winfield that it would not recognize the transfer between Winfield and MDS. As PennEnergy claimed, the Notice of Joinder was not proper under Section 6.2 of the JDA, as MDS did not agree to be bound by all of the terms and conditions of the JDA. *See* Correspondence, 12/21/18, at 1-2. On March 27, 2019, following a number of correspondences between the parties, MDS sent PennEnergy a letter, declaring:

> MDS entered into the Assignment [with Winfield] with the expectation that it would be able to utilize the intangible drilling costs ("IDC") tax deductions from the development of the Contract Areas and Wellbores. PennEnergy now has

_____

every kind and character pertinent thereto or arising therefrom."  JDA, 7/12/12, at § 1.1. The term "Participating Interest Share" is, essentially, the percentage of the Working Interest that each party holds within the AMI. At the time the JDA was executed, PennEnergy held approximately 80%, and Winfield approximately 20%, of the Participating Interest Shares. *Id.* at § 2.1(b).

- 4 -

unequivocally rejected the Joinder, and has unconditionally declined to accept any funds MDS was willing to tender for its share of the development costs. Because PennEnergy already has begun the process of drilling and completing the wells associated with the Contract Areas and Wellbores, and PennEnergy did so without accepting funds from MDS, those funds are currently not "at risk" for purposes of the IDC tax deductions. Consequently, if Winfield cannot reach a resolution with PennEnergy regarding the validity of the Joinder prior to March 31, 2019, PennEnergy's improper conduct will prevent MDS from having its funds at risk for the development of the Contract Areas and Wellbores within the period mandated by the applicable prepaid IDC rules, resulting in the loss of the tax benefits MDS anticipated from investing its funds in those Contract Areas and Wellbores.

. . . Given the circumstances and the anticipated loss of a principal benefit of its bargain with Winfield, if Winfield fails to obtain clear title to those interests by March 31, 2019, MDS will have no choice but to unwind the Assignment.

This letter therefore serves as Notice that, unless Winfield is able to rectify with PennEnergy the issues pertaining to the Joinder prior to March 31, 2019, then, effective April 1, 2019, the Assignment and Bill of Sale pertaining to the November 27, 2018 interests is hereby terminated and the Notice of Joinder of the same is rescinded.

MDS Correspondence to PennEnergy, 3/27/19, at 1-2.

Consistent with the above, on April 1, 2019, Winfield and MDS executed an "Assignment and Bill of Sale," which transferred the Working Interest in the W-45 and W-71 wellbores from MDS back to Winfield. Further, that day, Winfield and MDS executed a "Termination and Rescission of Notice of Joinder" to the JDA. In relevant part, this agreement of rescission declared:

WHEREAS, MDS and Winfield provided [PennEnergy] with a Notice of Joinder to [the JDA] and Applicable Operating Agreement ("Joinder"), dated November 27, 2018, pursuant to Section 6.2 of the JDA, wherein each represented and

warranted to [PennEnergy] that the assignment was made in accordance with applicable Law . . . and the terms and conditions of the JDA and the Applicable Operating Agreement.

WHEREAS, upon receipt of the Joinder, [PennEnergy] purported to "reject" the assignment and the Joinder, claiming the Joinder was inconsistent with the transfer provisions of the JDA and was, therefore, invalid.

WHEREAS, [PennEnergy's] conduct has created commercial impracticability and has intentionally frustrated the purpose of the assignment and Joinder, making it impossible for MDS and Winfield to proceed with the assignment and Joinder and interfering with the operations of each.

AND NOW THEREFORE, MDS and Winfield hereby give notice to [PennEnergy] that, due to commercial impossibility and frustration of purpose caused by [PennEnergy] in connection with a transfer of certain [] Working Interests in wellbores only in Winfield's Participating Interest Shares . . . Joinder is terminated, rescinded and nullified as of April 1, 2019 ("Termination Date").

Termination and Rescission of Notice of Joinder to the JDA, 4/1/19, at 1-2 (emphasis omitted).

In 2020, Appellants filed a complaint in the Butler County Court of Common Pleas against PennEnergy, captioned: "*MDS Energy Development, LLC, as Managing General Partner for MDS 2018 – Marcellus Shale Development, LP v. PennEnergy Resources, LLC*" (hereinafter "the 2020 Butler County Action"). This complaint asserted the sole claim of tortious interference with contract. In support of their tortious interference claim, Appellants contended that "PennEnergy improperly rejected the [November 27, 2018 assignment and Notice of Joinder between Winfield and MDS] with the intention of harming [Appellants]" and that, "[a]s a result of being denied

its participation in the specified wellbores, [Appellants] have suffered and will continue to suffer tens of millions of dollars in damages." Complaint in the 2020 Butler County Action, 11/25/20, at ¶¶ 81-92.

PennEnergy filed preliminary objections to this complaint and, on March 8, 2021, the trial court dismissed the complaint without prejudice. Within its order, the trial court gave Appellants 20 days leave to file an amended complaint "to clarify the relationship between MDS Energy Development, LLC and MDS 2018-LP." Trial Court Order, 3/8/21, at 1-2. The trial court further ordered: "[i]f an amended complaint is not filed within said timeframe, the Prothonotary is directed to dismiss this case, without prejudice." *Id.* at 2.

Appellants did not amend their complaint and, on April 1, 2021, the prothonotary acted in accordance with the trial court's March 8, 2021 order and dismissed the case "without prejudice." *See* Docket Entry, 4/1/21, at 1.

On September 2, 2022, MDS sent PennEnergy a Dispute Notice Pursuant to Section 11.10(a) of the JDA. Within this Dispute Notice, MDS claimed that PennEnergy breached the JDA when PennEnergy refused to recognize the November 27, 2018 transfer between Winfield and MDS. MDS's Dispute Notice, 9/2/22, at 1. MDS claimed that, as a result of this breach, PennEnergy caused MDS to suffer over $5 million in damages. *Id.* at 3. MDS further declared: "MDS is hopeful that the parties may be able to reach an amicable resolution of this dispute through negotiation. However, if we do not hear from you within 20 days, MDS intends to commence arbitration proceedings pursuant to Section 11.10(b) of the JDA." *Id.*

On October 5, 2022, Appellants filed a Demand for Arbitration and Statement of Claim with the AAA, claiming that PennEnergy breached the JDA when PennEnergy: 1) "refused to recognize MDS's proper joinder to the JDA;" 2) "ignored MDS's request for information that it was entitled to under the JDA;" and, 3) "refused to engage in good faith negotiations with MDS following receipt of its Dispute Notice." Appellants' Statement of Claim, 10/5/22, at 10-11. Appellants claimed that these material breaches of the JDA caused Appellants to suffer "damages in excess of $5 million." *Id.* at 11.

In response to MDS's Dispute Notice, PennEnergy initiated the current action against MDS on September 19, 2022, by filing a complaint seeking declaratory judgment and injunctive relief. Within its amended complaint, which PennEnergy filed against both Appellants, PennEnergy first sought a declaratory judgment in its favor and against Appellant MDS-2018. Specifically, PennEnergy requested the trial court hold that Appellant MDS-2018 "is not a party to the JDA as it relates to Contract Areas W-45 and W-71 and, thus, has no agreement with PennEnergy to arbitrate under JDA Section [11.10] any breach of contract claims [Appellant MDS-2018] seeks to pursue involving the rescinded November 27, 2018 transaction." PennEnergy's Amended Complaint, 10/31/22, at ¶ 94. In support, PennEnergy claimed that Appellant MDS-2018 "did not sign the JDA, and it is not a named party to or an intended third-party beneficiary of the JDA" – and, since "only [Appellant MDS] executed the November 27, 2018 Notice of Joinder with Winfield," Appellant MDS-2018 "has no basis to [compel

- 8 -

PennEnergy to] arbitrate under JDA Section 11.10[] any breach of contract claims that [Appellant MDS-2018] seeks to pursue involving the November 27, 2018 transaction." *Id.* at ¶¶ 88-94.

In Count II of PennEnergy's amended complaint, PennEnergy sought a declaratory judgment against Appellant MDS and asked the trial court to hold that Appellant MDS "is not a party to the JDA as it relates to Contract Areas W-45 and W-71 and, thus, has no agreement with PennEnergy to arbitrate under JDA Section [11.10] any breach of contract claims [Appellant MDS] seeks to pursue in its September 2, 2022 Dispute Notice involving the rescinded November 27, 2018 transaction." *Id.* at ¶ 103. According to PennEnergy, Appellant MDS "did not sign the JDA, and it is not a named party to or intended third-party beneficiary of the JDA." *Id.* at ¶ 98. Further, PennEnergy claimed, even though Appellant MDS and Winfield executed an assignment and "Notice of Joinder" on November 27, 2018, which bound Appellant MDS to the terms of the JDA, Appellant MDS and Winfield later unwound the November 27, 2018 transaction and mutually "terminated, rescinded, and nullified as of April 1, 2019" the Notice of Joinder. *Id.* at ¶ 99. Thus, PennEnergy claimed, "[w]ithout a valid and enforceable joinder to the JDA as it relates to Contract Areas W-45 and W-71, [Appellant MDS] has no basis to demand PennEnergy arbitrate under JDA Section [11.10] any breach of contract claims." *Id.* at ¶ 102.

Count III of PennEnergy's amended complaint requested that the trial court enter a declaratory judgment against both Appellants and declare that

Appellants "are estopped as a matter of law from pursuing any arbitration of their [] breach of contract claims involving the November 27, 2018 transaction given their failure to assert those claims" in the prior, 2020 Butler County Action that Appellants filed against PennEnergy. *Id.* at ¶ 105. PennEnergy noted that Appellants' complaint in the 2020 Butler County Action raised the sole claim of tortious interference with contractual relations – and that "[t]he breach of contract claims that [Appellants currently] seek to arbitrate against PennEnergy [arose] out of the same transaction or occurrence that served as [the] basis for the [2020] tortious interference claim." *Id.* at ¶ 108. According to PennEnergy, since Appellants did not include their current breach of contract claim in their prior 2020 Butler County Action, Pennsylvania Rule of Civil Procedure 1020(d) requires that the trial court hold the breach of contract claim waived. *Id.* at 111; *see also* Pa.R.C.P. 1020(d) ("[i]f a transaction or occurrence gives rise to more than one cause of action heretofore asserted in assumpsit and trespass, against the same person, including causes of action in the alternative, they shall be joined in separate counts in the action against any such person. Failure to join a cause of action as required by this subdivision shall be deemed a waiver of that cause of action as against all parties to the action").

In Count IV of its amended complaint, PennEnergy claimed that it was entitled to a declaratory judgment against Appellant MDS, holding that Appellant MDS was "judicially and/or collaterally estopped from pursuing any arbitration . . . of its breach of contract claims involving the November 27,

2018 transaction." *Id.* at ¶¶ 113 and 116. PennEnergy claimed that in the 2020 Butler County Action, Appellant MDS "successfully argued to [the trial court] that it had its own claim for tortious interference which it could pursue" because Appellants were not parties to the JDA and did not have a contractual relationship with PennEnergy. According to PennEnergy, "[t]he doctrines of judicial and/or collateral estoppel bar [Appellant MDS] from now arguing that it is a party to the JDA when it previously argued successfully to [the trial court] that it was not." *Id.* at ¶ 116.

In its fifth count, PennEnergy sought a declaratory judgment against Appellant MDS, holding that Appellant MDS was estopped from pursuing its breach of contract claim based upon assertions made by Appellant MDS within the context of a prior arbitration proceeding. According to PennEnergy, in another, prior arbitration proceeding between the parties (one that occurred in 2019),[2] Appellant MDS "successfully argued that because [Appellant MDS] had no contractual relationship with PennEnergy, [it] could not pursue breach of contract claims against PennEnergy for [the] alleged breaches of the JDA" and that Appellant MDS was thus permitted to assert a tortious interference with contract claim against PennEnergy. *Id.* at ¶ 121; *see also Salsberg v. Mann*, 310 A.3d 104, 123 ("a party cannot interfere with its own contract") (quotation marks and citations omitted). This 2019 arbitration proceeding eventually resulted in "MDS Energy Development, LLC, as general partner for

_____

[2] We shall recount more fully the factual and procedural background of the 2019 arbitration proceeding in the analysis section of this decision.

the MDS [2017] Marcellus Shale Development LP" receiving an arbitration award of $2.4 million against PennEnergy for its tortious interference with contract claim. Nevertheless, after the Allegheny County Court of Common Pleas confirmed the award, this Court reversed the common pleas court and ordered the court to vacate the award. The Pennsylvania Supreme Court later denied Appellant MDS's petition for allowance of appeal. *See PennEnergy Res., LLC v. Winfield Res., LLC*, 301 A.3d 439 (Pa. Super. 2023), *appeal denied*, 2024 WL 1756010 (Pa. 2024).

In Count VI of its amended complaint, PennEnergy sought a declaratory judgment against Appellants, holding that Appellants were estopped from pursuing arbitration of their contractual claims because Appellants filed their 2020 Butler County Action complaint in the court of common pleas and then defended against PennEnergy's preliminary objections in that court. PennEnergy's Amended Complaint, 10/31/22, at ¶ 127. In doing so, according to PennEnergy, Appellants "accepted resolution by judicial process rather than arbitration of their [] claims against PennEnergy involving the rescinded November 27, 2018 transaction." *Id.*

Finally, PennEnergy sought a preliminary injunction against Appellants, declaring that Appellants are precluded from "filing any arbitration against PennEnergy until [the trial court] resolves" the substantive claims in its complaint. *Id.* at ¶ 130.

Also on October 31, 2022, PennEnergy filed a separate "Motion for Preliminary Injunction or Other Special Relief to Stay Arbitration" (hereinafter

"Motion for Preliminary Injunction").  Within this motion, PennEnergy repeated the claims it raised in its amended complaint and requested that, for these reasons, the trial court enjoin Appellants from proceeding with their arbitration action.  *See* PennEnergy's Motion for Preliminary Injunction, 10/31/22, at 1-18.

The trial court held a hearing on PennEnergy's Motion for Preliminary Injunction and, on January 12, 2023, the trial court entered an order that granted PennEnergy's request for a preliminary injunction and stayed Appellants' arbitration action pending final resolution of PennEnergy's declaratory and injunctive claims.  *See* Trial Court Order, 1/12/23, at 1.  With respect to the essential prerequisite that the "petitioner is likely to prevail on the merits," which is required to grant a preliminary injunction, the trial court held:  "[o]n the issue as to whether there is an [enforceable] arbitration provision, [the trial court] finds that it is likely that PennEnergy will [succeed in demonstrating] that MDS has no contractual relationship with PennEnergy;" "[the trial court] also finds merit in PennEnergy's rescission argument that once the assignment/joinder was rescinded, it extinguished MDS's ability to pursue arbitration;" and, "[the trial court] also finds merit in PennEnergy's estoppel and waiver arguments."  Trial Court Opinion, 1/12/23, at 5-6. Further, since the trial court also found that PennEnergy satisfied the remaining prerequisites necessary for a preliminary injunction, the trial court granted PennEnergy's motion, issued the preliminary injunction, and stayed Appellants' arbitration action.  *See id.* at 6-8.

- 13 -

Appellants filed a timely notice of appeal from the trial court's order, which we shall treat as an immediately appealable mandate that both granted PennEnergy's request for preliminary injunction and stayed the proceedings related to Appellants' arbitral claims. *See* Pa.R.A.P. 311(a)(4) (declaring that, generally, an appeal may be taken as of right from an order that grants or denies an injunction); *see also* 42 Pa.C.S.A. § 7320 ("[a]n appeal may be taken from . . . (2) [a] court order granting an application to stay arbitration made under section 7304(b)"); *Nken v. Holder*, 556 U.S. 418, 428-429 (2009) ("in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam*. . . . By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability. . . . [A stay that] relat[es] only to the conduct or progress of litigation before the court, ordinarily is not considered an injunction") (quotation marks, citations, and corrections omitted). Appellants raise five claims to this Court:

> [1.] Did the trial court err in finding that [PennEnergy] had met its burden of showing a likelihood of success on the merits in the absence of any legal analysis in support of this finding?
>
> [2.] Did the trial court err in finding that an alleged rescission of an underlying contract extinguished MDS's arbitration rights in the absence of any evidence that the relevant parties intended to rescind the at-issue arbitration provision, in circumstances where the lead case the trial court relied on was withdrawn by this Court prior to the trial court's January 12, 2023 Memorandum Opinion and Order of Court, and in

circumstances where the trial court refused to follow on-point federal precedent supporting MDS's position even as it acknowledged that "[n]either party nor the court could find a Pennsylvania appellate decision on point as to whether an arbitration clause in a contract survives rescission"?

[3.] Did the trial court err in finding "merit in PennEnergy's estoppel and waiver argument" without analyzing, or even mentioning, the elements for estoppel and waiver under Pennsylvania law?

[4.] Did the trial court err in finding that PennEnergy had met its burden of showing that it would suffer immediate, irreparable harm absent an injunction where its sole support for this finding is a case that was withdrawn by this Court prior to the trial court's January 12, 2023 Memorandum Opinion and Order of Court?

[5.] Did the trial court err in finding that PennEnergy had met its burden of showing that an injunction will restore the parties to the *status quo* where its only support for this finding are factual averments that are contradicted by the record?

Appellants' Brief at 3-4.

Appellants appeal from an order that, by its plain terms, granted PennEnergy's Motion for Preliminary Injunction. "[A]n appellate court reviews an order granting or denying a preliminary injunction for an abuse of discretion." *SEUI Healthcare Pa. v. Comm.*, 104 A.3d 495, 501 (Pa. 2014). "Under this highly deferential standard of review, an appellate court does not inquire into the merits of the controversy, but examines the record to determine if there were any apparently reasonable grounds for the action of the court below." *Id.* (quotation marks and citations omitted). "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision

of the trial court." ***Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.***, 828 A.2d 995, 1000 (Pa. 2003) (quotation marks, citations, and corrections omitted). As our Supreme Court explained:

> [The Pennsylvania Supreme] Court set out the reasons for this highly deferential standard of review almost a hundred years ago:
>
>> It is somewhat embarrassing to an appellate court to discuss the reasons for or against a preliminary decree, because generally in such an issue we are not in full possession of the case either as to the law or testimony – hence our almost invariable rule is to simply affirm the decree, or if we reverse it to give only a brief outline of our reasons, reserving further discussion until appeal, should there be one, from final judgment or decree in law or equity.

***Id.*** at 1000-1001, *quoting **Hicks v. Am. Nat'l Gas Co.***, 57 A. 55, 55-56 (Pa. 1904).

For a preliminary injunction to issue, the petitioner must establish the following:

> First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably

suited to abate the offending activity. Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

**Summit Towne Ctr.**, 828 A.2d at 1001 (citations omitted).

Here, the trial court granted PennEnergy's Motion for Preliminary Injunction and declared that Appellants' arbitration action was stayed pending judicial resolution of this case. As we have held, "before [PennEnergy was] entitled to injunctive relief," PennEnergy was required to "prove that it has a clear right to enjoin the arbitration proceeding." **DiLucente Corp. v. Pa. Roofing Co., Inc.**, 655 A.2d 1035, 1038 (Pa. Super. 1995). We explained:

> When one party to an agreement to arbitrate seeks to enjoin the other from proceeding to arbitration, judicial inquiry is limited to the questions of whether an agreement to arbitrate was entered into and whether the dispute involved falls within the scope of the arbitration provision. In accordance with the general policy favoring the arbitration of contractual differences, an order enjoining arbitration of a particular grievance should not be granted unless it can be said with positive assurance that the [arbitration] agreement involved is not susceptible of an interpretation that covers the asserted dispute.

**Id.** (quotation marks and citations omitted). "Once it has been determined that an agreement to arbitrate exists and that the dispute falls within the arbitration provision, the trial court . . . must order the parties to proceed with arbitration. In such cases, the court is not free to examine the merits of the controversy." **Messa v. State Farm Ins. Co.**, 641 A.2d 1167, 1168 (Pa. Super. 1994); 42 Pa.C.S.A. § 7304(e) ("An application for a court order to proceed with arbitration shall not be refused, nor shall an application to stay arbitration be granted, by the court on the ground that the controversy lacks

merit or bona fides or on the ground that no fault or basis for the controversy sought to be arbitrated has been shown").

"Pennsylvania has a well-established public policy that favors arbitration, and this policy aligns with the federal approach expressed in the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (FAA)." *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 660 (Pa. Super. 2013). "This policy applies equally to all arbitration agreements." *MacPherson v. Magee Mem'l Hosp. for Convalescence*, 128 A.3d 1209, 1219 (Pa. Super. 2015) (*en banc*).

Nevertheless, the policy favoring arbitration "was not intended to render arbitration agreements more enforceable than other contracts, and the FAA [was not] designed to preempt all state law related to arbitration." *Pisano*, 77 A.3d at 661 (quotation marks and citations omitted). "Thus, when addressing the specific issue of whether there is a valid agreement to arbitrate, courts generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration." *Id.* (quotations and citations omitted).

"[A]rbitration is a matter of contract, and, absent an agreement between the parties to arbitrate an issue, the parties cannot be compelled to arbitrate that issue." *Lincoln Univ. of Com. Sys. of Higher Educ. v. Lincoln Univ. Chapter of the Am. Ass'n of Univ. Professors*, 354 A.2d 576, 580 (Pa. 1976) (quotation marks and citations omitted). Further, "[i]n general, only parties to an arbitration agreement are subject to arbitration."

*Elwyn v. DeLuca*, 48 A.3d 457, 461 (Pa. Super. 2012) (quotation marks and citations omitted).

**Appellant MDS-2018**

First, Appellants claim that the trial court erred when it granted PennEnergy's Motion for Preliminary Injunction as to Appellant MDS-2018.

As noted above, generally "only parties to an arbitration agreement are subject to arbitration." *Elwyn*, 48 A.3d at 461. With respect to Appellant MDS-2018, Appellants' brief does not claim or make any argument that the trial court erred when it held that Appellant MDS-2018 "has no contractual relationship with PennEnergy" and that PennEnergy is, thus, likely to prevail on the merits on its claim that it cannot be compelled to arbitrate any dispute with Appellant MDS-2018. *See* Trial Court Opinion, 1/12/23, at 4-5; *see also* Appellants' Brief at 17-45. To be sure, only Appellant MDS executed the Notice of Joinder to the JDA – and, thus, only Appellant MDS expressly became a party to the JDA and the JDA's arbitration provision. *See* Notice of Joinder, 11/27/18, at 1-2. Moreover, the JDA specifically disclaimed "third-party beneficiary rights in any Person not party to" the JDA. JDA, 7/12/12, at § 11.7 ("nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not party to this Agreement").[3]

_____

[3] The JDA defines the term "Person" to mean "a natural person or Entity." JDA, 7/12/12, at § 1.1. It then defines the term "Entity" to mean: "a firm,
*(Footnote Continued Next Page)*

- 19 -

Therefore, any claim that the trial court erred when it concluded that PennEnergy is likely to prevail on the merits regarding its claim that Appellant MDS-2018 "has no contractual relationship with PennEnergy" is both waived and meritless. *See Commonwealth v. Miller*, 721 A.2d 1121, 1124 ("[f]ailure to brief an issue . . . is to waive it").

Notwithstanding the above, Appellants claim that PennEnergy was not entitled to a preliminary injunction as against Appellant MDS-2018 because PennEnergy failed to prove that: 1) "an injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by money damages" and 2) "a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct." Appellants' Brief at 41-45; *see also Summit Towne Ctr.*, 828 A.2d at 1001 (listing the essential prerequisites for granting a preliminary injunction).

Initially, Appellants claim that PennEnergy failed to establish that an injunction was necessary to prevent immediate and irreparable harm because, even if Appellants MDS-2018's breach of contract claim were to be decided in arbitration, any harm amounts to simple monetary damages. *See* Appellants' Brief at 41-43. Appellants' claim fails.

---

corporation, **partnership (including a limited partnership)**, limited liability company, joint venture, association, trust, unincorporated organization, Governmental Authority or any other entity." *Id.* (emphasis added). We note that Appellant MDS-2018 is a limited partnership.

We explained:

> a plaintiff seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by money damages. In order to meet this burden, a plaintiff must present concrete evidence demonstrating actual proof of irreparable harm. The plaintiff's claimed "irreparable harm" cannot be based solely on speculation and hypothesis. Moreover, for purposes of a preliminary injunction the claimed harm must be irreversible before it will be deemed irreparable.

*Greenmoor, Inc. v. Burchick Constr. Co.*, 908 A.2d 310, 314 (Pa. Super. 2006) (citations, emphasis, and some quotation marks omitted).

Our Supreme Court has repeatedly declared that "arbitration is a matter of contract, and, absent an agreement between the parties to arbitrate an issue, **the parties cannot be compelled to arbitrate that issue**." *See Lincoln Univ.*, 354 A.2d at 580 (emphasis added). As our Supreme Court has also held, a trial court may issue a preliminary injunction and enjoin an arbitration proceeding where the petitioner is able to "establish that he did not agree to arbitrate, or that the agreement to arbitrate, limited in scope, did not embrace the disputes in issue." *See Flightways Corp. v. Keystone Helicopter Corp.*, 331 A.2d 184, 185 (Pa. 1975); *see also Schoellhammer's Hatboro Manor, Inc. v. Local Joint Executive Bd.*, 231 A.2d 160 (Pa. 1967) (holding: the trial court properly granted a preliminary injunction, which restrained a union from compelling a non-signatory to a collective bargaining agreement from submitting a dispute to arbitration, as the non-signatory "clearly was not a party to the collective bargaining

agreement, and, therefore, could not be compelled to submit to arbitration under the agreement"). In light of these declarations by our Supreme Court, we echo the Third Circuit Court of Appeals and hold:

> we think it obvious that the harm to a party would be *per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority. Even if such things could be known in advance, it would be irrelevant whether the arbitrator's determination would be the same as the court's. A reluctant party has a right to a judicial determination of his obligation to arbitrate.

*PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 515 (3rd Cir. 1990), *overruled on other grounds as recognized in* *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3rd Cir. 2005); *see also Am. Hardware Mut. Ins. Co. v. Silvestri*, 445 A.2d 1269, 1269-1270 (Pa. Super. 1982) (holding: the trial court erred when it denied a non-consenting party's request to enjoin arbitration and, since "th[e] claim did not fall within the ambit of the arbitration clause," this Court ordered that arbitration was enjoined). Thus, we reject the claim that Appellant MDS-2018 is entitled to relief because PennEnergy failed to identify an immediate and irreparable harm that would arise if Appellant MDS-2018 were permitted to arbitrate its contractual claims.

Appellants also claim that PennEnergy was not entitled to a preliminary injunction as against Appellant MDS-2018 because PennEnergy failed to prove that "a preliminary injunction will properly restore the parties to their status

as it existed immediately prior to the alleged wrongful conduct." **See** Appellants' Brief at 43-45.

"The *status quo* to be maintained by a preliminary injunction is the legal status that preceded the pending controversy." **The York Group, Inc. v. Yorktowne Caskets, Inc.**, 924 A.2d 1234, 1244 (Pa. Super. 2007). Here, the "alleged wrongful conduct" was Appellant MDS-2018 proceeding with its arbitration action against a non-consenting PennEnergy. To halt this conduct, PennEnergy obtained a preliminary injunction that effected a stay of the underlying arbitration proceedings. The preliminary injunction thus stayed Appellant MDS-2018's arbitration proceeding against PennEnergy and, in so doing, maintained the *status quo* between the parties. Appellants' claim to the contrary is meritless and we thus affirm the trial court's order as to Appellant MDS-2018.

## Appellant MDS

With respect to Appellant MDS, we note that Appellant MDS and Winfield executed the Notice of Joinder to the JDA on November 27, 2018 and, for purposes of this appeal, Appellant MDS automatically became a party to the JDA on December 1, 2018. **See** JDA, 7/12/12, at § 6.2. Indeed, PennEnergy's dispositive motion recognized the fact that "MDS Energy executed with Winfield a November 27, 2018 joinder to the JDA, which contains an arbitration provision" – and, in this motion, PennEnergy never claimed that the Notice of Joinder was somehow defective or that Appellant MDS somehow

did not become a party to the JDA. **See** PennEnergy's Motion for Preliminary Injunction, 10/31/22, at 1-18. Rather, PennEnergy claimed – and the trial court agreed – that PennEnergy was likely to prevail on the merits on its claim against Appellant MDS because: 1) Appellant MDS and Winfield later "rescinded" the joinder to the JDA, thus "leaving [Appellant MDS] in the position as having never entered into the November 27, 2018 transaction for any purposes, including [] the November 27, 2018 JDA joinder;" 2) Appellant MDS was collaterally estopped from relitigating the issue of whether it was a party to the JDA because, in both the prior arbitration proceeding and in the 2020 Butler County Action, the arbitration panel and the court of common pleas held that Appellant MDS was not a party to the JDA; 3) Appellant MDS was judicially estopped from claiming that it was a party to the JDA because, in both the prior arbitration proceeding and in the 2020 Butler County Action, it successfully claimed that it was not a party to the JDA; 4) Appellant MDS waived its right to arbitration because it "file[d] a complaint rather than an arbitration demand in the 2020 Butler County Action;" and, 5) Appellant MDS waived its breach of contract claim by failing to pursue that claim in its 2020 Butler County Action. **See id.** at 6-17; **see also** Trial Court Opinion, 1/12/23, at 5-6.

On appeal, Appellant MDS claims that the trial court erred in each of these rulings and that the trial court's order, which granted PennEnergy's Motion for a Preliminary Injunction and stayed Appellant MDS's arbitration action against PennEnergy, must be vacated. **See** Appellants' Brief at 17-40.

We will analyze the claims in the order listed above; however, in the end, we agree with Appellant MDS and conclude the trial court erred when it stayed Appellant MDS's arbitration action.

## I. The Trial Court Erred in Concluding that PennEnergy's Rescission Claim Entitled it to a Stay of Arbitration

First, Appellant MDS claims that the trial court erred in concluding that it was not a party to the JDA or subject to the JDA's arbitration clause because, the trial court reasoned, Appellant MDS ultimately "rescinded" its Notice of Joinder to the JDA. **See** Appellants' Brief at 33.

To summarize, on July 12, 2012, PennEnergy and Winfield entered into the JDA. This JDA contains a broad dispute resolution and arbitration provision, which declares that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement" must be resolved through a particular dispute resolution process and, failing that, must be submitted to arbitration. **See** JDA, 7/12/12, at § 11.10.

Under the JDA, Winfield had the power to transfer "all or any portion of its rights or obligations under [the JDA]" and that any such transfer would be effective against PennEnergy "as of the first business day of the calendar month immediately following" PennEnergy's receipt of: proper notice and the transferee's express agreement, in writing, declaring that the transferee will be "bound by all of the terms and conditions of" the JDA and the applicable operating agreements. **See id.** at §§ 6.1-6.2.

On November 27, 2018, Winfield and Appellant MDS entered into:  1) a Purchase and Sale Agreement concerning certain wellbores located in Contract Areas W-45 and W-71 and 2) a Notice of Joinder to the JDA, where Appellant MDS agreed to be "bound by the terms of the JDA."  That day, Appellant MDS and Winfield mailed the executed Notice of Joinder to PennEnergy and, for purposes of this appeal, Appellant MDS became a party to the JDA on December 1, 2018.[4]

While Appellant MDS was a party to the JDA, PennEnergy allegedly breached the terms of that agreement when it "refused to recognize MDS's proper joinder to the JDA."  *See* Appellants' Statement of Claim, 10/5/22, at 10-11.  Appellant MDS also alleged that PennEnergy further breached the JDA when it:  "ignored MDS's request for information that it was entitled to under the JDA" and "refused to engage in good faith negotiations with MDS following receipt of its Dispute Notice."  *See id.*  Then, on April 1, 2019, Winfield and Appellant MDS executed the "Termination and Rescission of Notice of Joinder," which declared that their November 27, 2018 Notice of Joinder was "terminated, rescinded and nullified as of April 1, 2019" because PennEnergy

_____

[4] PennEnergy, in its motion for preliminary injunction, noted that MDS later rescinded its joinder in the JDA and its November 2018 transaction with Winfield.  *See* PennEnergy Motion for Preliminary Injunction, 10/21/22, at 6 ¶ 16.  PennEnergy then argued, under Pennsylvania law, that the rescission abrogated MDS's rights under the Winfield transaction "from the inception" and "unmade" MDS's joinder into the JDA.  *See id.* at 6-7.  Thus, PennEnergy's challenge to the validity of MDS's joinder into the JDA rested exclusively on the strength of the subsequent rescission agreement; PennEnergy did not otherwise contest the validity of the joinder or MDS's status as a party to the JDA as of the moment MDS and Winfield entered into those agreements.

allegedly frustrated the purpose of the prior agreement.[5]  Termination and Rescission of Notice of Joinder to the JDA, 4/1/19, at 1-2.

After Appellant MDS commenced arbitration proceedings against PennEnergy, PennEnergy filed a Motion for Preliminary Injunction against Appellant MDS.  Within this motion, PennEnergy sought to stay the arbitration proceedings because (among other things) Appellant MDS and Winfield voluntarily rescinded the entire November 27, 2018 transaction, including the Notice of Joinder.  According to PennEnergy, this left Appellant MDS "in the position as having never entered into the November 27, 2018 transaction for any and all purposes, including without limitation the November 27, 2018 JDA joinder."  PennEnergy's Motion for Preliminary Injunction, 10/31/22, at 7.  The trial court agreed with PennEnergy and held that, when Appellant MDS and Winfield rescinded the November 27, 2018 Notice of Joinder, the parties "unmade" the Notice of Joinder and destroyed "all the contract's force and effectiveness" from its inception.  Trial Court Opinion, 1/12/23, at 6 (emphasis omitted).

Now on appeal, Appellant MDS claims the trial court erred in concluding that its subsequent termination of the November 27, 2018 transaction with Winfield and its rescission of the joinder into the JDA retroactively impaired or defeated its status as a party to the JDA.  We agree with Appellant MDS.

_____

[5] As noted above, on April 1, 2019, Winfield and MDS also executed an "Assignment and Bill of Sale," which transferred the Working Interest in the W-45 and W-71 wellbores from MDS back to Winfield.

As our Supreme Court has held, "[t]he parties to a contract may at any time rescind it, either in whole or in part, by mutual consent, and the surrender of their mutual rights is sufficient consideration." *Flegal v. Hoover*, 27 A. 162, 162 (Pa. 1893); *see also Kirk v. Brentwood Manor Homes, Inc.*, 159 A.2d 48, 50-52 (Pa. Super. 1960). The Restatement (Second) of Contracts terms this type of rescission an "agreement of rescission." Restatement (Second) of Contracts § 283 (1981).[6] It declares:

> (1) An agreement of rescission is an agreement under which each party agrees to discharge all of the other party's remaining duties of performance under an existing contract.
>
> (2) An agreement of rescission discharges all remaining duties of performance of both parties. It is a question of interpretation whether the parties also agree to make restitution with respect to performance that has been rendered.

---

[6] Section 406 of the Restatement (First) of Contracts is entitled "discharge of duties by agreement of the parties." In relevant part, it declares: "an agreement by the parties to a contract to rescind their contractual duties . . . discharges such duties." Restatement (First) of Contracts § 406. We note that the Pennsylvania Supreme Court has previously cited Section 406 of the First Restatement with approval. *Brownfield's Ex'rs v. Brownfield*, 25 A. 92, 93 (Pa. 1892); *Jordan v. Sun Life Assurance Co.*, 77 A.2d 631, 633 (Pa. 1951); *Allardice v. McCain*, 101 A.2d 385, 387-388 (Pa. 1953); *see also Kirk*, 159 A.2d at 50-52. We further observe that, as is relevant to this case, Section 406 of the First Restatement is substantively identical to Section 283 of the Second Restatement.

*Id.*[7]   Consideration for this type of agreement is "provided by each party's discharge of the duties of the other."[8]   *Id.* at cmt. a.   Further, as our Supreme Court has held, an agreement of rescission "necessarily implies a waiver of all rights thereunder by the parties."   ***Dreifus v. Columbian Exposition Salvage Co.***, 45 A. 370, 372 (Pa. 1900).

On April 1, 2019, Appellant MDS and Winfield executed the agreement of rescission, which declared that their prior Notice of Joinder was "terminated,

_____

[7] The Restatement (Second) of Contracts distinguishes an "agreement of rescission" from the judicial remedy of "rescission."   Restatement (Second) of Contracts § 283 cmt. a.   As explained in *Williston on Contracts*:

> [Mutual rescission by agreement of the parties] is a mutual agreement by the parties to an existing contract to discharge and terminate the rights and duties thereunder.   . . . [This differs from] rescission as a remedy.   Rescission sought as a remedy by a contracting party may be accomplished in one of two ways; in a legal rescission, one party unilaterally cancels the contract in response to a material breach on the part of the other party or for other valid reasons; in an equitable rescission, one party brings an action in a court with equitable jurisdiction asking the court to nullify the contract.

29 WILLISTON ON CONTRACTS § 73:15 (4th ed.)

[8] The issues addressed by the trial court, which are currently the subject of appellate review, center upon the effective scope of the rescission agreement and, in particular, whether and to what extent it impacted the validity of MDS's November 2019 transaction with Winfield or MDS's JDA joinder agreement. At no point has any party ever claimed that the November 2019 Winfield transaction or MDS's JDA joinder were ineffective when originally undertaken. Hence, undoing MDS's joinder in the JDA turns exclusively on PennEnergy's contention that MDS's rescission agreement with Winfield must be given retroactive effect so as to invalidate MDS's joinder in the JDA from the moment it occurred.

rescinded and nullified as of April 1, 2019," as PennEnergy allegedly frustrated the purpose of their prior agreement. This agreement of rescission thus superseded the prior Notice of Joinder and "discharge[d] **all remaining** duties of performance" between Appellant MDS and Winfield that arose from the Notice of Joinder.[9] ***See*** Restatement (Second) of Contracts § 283 (emphasis added). However, the agreement of rescission did not "alter reality or act as a DeLorean time machine." ***See Wilmore-Moody v. Zakir***, 999 N.W.2d 1, 6-7 (Mich. 2023) (in speaking of the judicial remedy of rescission, the Michigan Supreme Court declared: "while rescission is a legal fiction available as a contractual remedy for the defrauded party, it does not alter reality or act as a DeLorean time machine. In other words, although courts may engage in revisionist history when rescission is deemed an appropriate contractual remedy, that legal fiction does not actually create an alternate reality") (quotation marks and citations omitted). For purposes of this appeal, Appellant MDS **was** a party to the JDA from December 1, 2018 until April 1, 2019 and its claim that, during this time, PennEnergy breached the JDA is a claim that falls squarely under the JDA's broad arbitration provision.[10] ***See id.*** Thus, we conclude that the trial court abused its discretion when it held

---

[9] Of note, PennEnergy was not a party to either the Notice of Joinder or the agreement of rescission.

[10] Moreover, as is obvious, the agreement of rescission applied only to the Notice of Joinder. It had no effect upon the validity or the plain language of the JDA or the JDA's arbitration provision.

that the agreement of rescission caused Appellant MDS to have "never been" subject to the JDA's arbitration provision.

## II. The Trial Court Erred in Concluding that PennEnergy's Collateral Estoppel Claim Entitled it to a Stay of Arbitration

Next, Appellant MDS claims that the trial court erred in concluding that it was collaterally estopped from relitigating the issue of whether it was a party to the JDA. According to the trial court, Appellant MDS was collaterally estopped from relitigating this issue because, in both the prior arbitration proceeding and in the 2020 Butler County Action, the arbitration panel and the court of common pleas held that Appellant MDS was not a party to the JDA. *See* Trial Court Opinion, 1/12/23, at 6. We conclude that the trial court erred in applying collateral estoppel to this issue.

As our Supreme Court has explained:

> the doctrine of collateral estoppel, or issue preclusion, applies where the following four prongs are met:
>
> > (1) An issue decided in a prior action is identical to one presented in a later action;
> >
> > (2) The prior action resulted in a final judgment on the merits;
> >
> > (3) The party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and
> >
> > (4) The party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

- 31 -

*Rue v. K-Mart Corp.*, 713 A.2d 82, 84 (Pa. 1998). "Collateral estoppel relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication." *Skotnicki v. Ins. Dep't*, 175 A.3d 239, 247 (Pa. 2017) (quotation marks and citations omitted).

**A. The Prior Arbitration Proceeding**

As briefly stated above, in February 2019, Appellant MDS and PennEnergy were parties to an arbitration proceeding. In a prior opinion, we explained some of the relevant facts regarding the February 2019 dispute:

> [In 2012,] PennEnergy and Winfield entered into [the JDA]. . . . [O]n February 5, 2018, Winfield and MDS executed a purchase and sale agreement[, where Winfield agreed to sell (and MDS agreed to purchase) the Working Interest in certain wellbores located in the AMI's W-9, W-32, and W-34 Contract Areas.] MDS would in turn assign the working interest to a not-yet-identified limited partnership of which MDS would be the managing general partner. As compensation for the transfer, Winfield would receive units in that unidentified limited partnership, later denominated as MDS 2017. . . .
>
> Concurrent with their agreement, Winfield and MDS [executed a Notice of Joinder to the JDA]. As laid out in the [February 5, 2018 Notice of Joinder], MDS agreed only to be bound by the JDA "specifically as it relates to and limited to" the three contract areas within the AMI that it was receiving. Upon receiving the [Notice of Joinder], PennEnergy rejected it and challenged the validity of Winfield's transfer of the 9.93 percent interest to MDS because it refused to consent to all the provisions of the JDA.

*PennEnergy Res.*, 301 A.3d at 445-446.

As a result of PennEnergy's actions, on October 26, 2018, Appellant MDS sold the Working Interest in the wellbores back to Winfield and, that same day, Appellant MDS and Winfield executed an agreement of rescission regarding the February 5, 2018 Notice of Joinder. This agreement of rescission declared that the February 5, 2018 Notice of Joinder was "terminated, rescinded and nullified as of October 26, 2018." *See* Agreement of Rescission, 10/26/18, at 1.

Appellant MDS then filed a complaint against PennEnergy in the Court of Common Pleas of Armstrong County, where it claimed that PennEnergy tortiously "interfere[ed] in the assignment between Winfield and MDS" by "improperly reject[ing] the" Notice of Joinder. *See* Appellant MDS's Complaint at 464 WDA 2022, 3/9/18, at ¶ 43. In response, PennEnergy filed a demand for arbitration and, eventually, Appellant MDS was joined in the arbitration proceedings, despite Appellant MDS's claim that it was never a party to the JDA and, thus, was never subject to the JDA's arbitration provision. *See* Appellant MDS's Motion to Stay Arbitration at 464 WDA 2022, 3/30/18, at 1-7.

During the arbitration proceedings, Appellant MDS claimed that PennEnergy tortiously interfered in its contract with Winfield. Following a hearing, the arbitrator awarded $2.4 million to Appellant MDS in its capacity as "general partner for the MDS [2017] Marcellus Shale Development LP," for its tortious interference claim. *See* Arbitrator's Final Award, 5/14/19, at 2; *see also **PennEnergy Res.**,* 301 A.3d at 448 ("the arbitrator identified MDS as the general partner for MDS 2017, the entity who had suffered damages").

As noted above, after the Allegheny County Court of Common Pleas confirmed the award, this Court reversed the common pleas court and ordered the court to vacate the award. The Pennsylvania Supreme Court later denied Appellant MDS's petition for allowance of appeal. *See PennEnergy Res.*, 301 A.3d at 439, *appeal denied*, 2024 WL 1756010 (Pa. 2024).

From the above, it is apparent that any issue decided in the 2019 arbitration proceeding does not collaterally estop Appellant MDS from now claiming that its November 27, 2018 Notice of Joinder made it a party to the JDA and subject to the JDA's arbitration provision. This is because the 2019 arbitration proceeding concerned a completely different contract (the February 5, 2018 Notice of Joinder as opposed to the November 27, 2018 Notice of Joinder), with different operative language, different deliveries, and different delivery dates, and concerning completely different wellbores (the wellbores in the W-9, W-32, and W-34 Contract Areas as opposed to the wellbores in the W-45 and W-71 Contract Areas, respectively). Simply stated, the issue of whether the February 5, 2018 Notice of Joinder bound Appellant MDS to the JDA is not "identical" to the issue of whether the November 27, 2018 Notice of Joinder bound Appellant MDS to the JDA. *See* Restatement (Second) of Judgments § 27 cmt. c ("[p]reclusion ordinarily is proper if the question is one of the legal effect of a document identical in all relevant respects to another document whose effect was adjudicated in a prior action. . . . In [] other instances, the bearing of the first determination is so marginal because of the separation in time and other factors negating any similarity that the first

judgment may properly be given no effect"); *see also Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2nd Cir. 2011) ("[i]f the issues are not identical, there is no collateral estoppel") (quotation marks, citations, and brackets omitted). As such, the trial court erred when it concluded that the 2019 arbitration proceeding collaterally estopped Appellant MDS from claiming that the November 27, 2018 Notice of Joinder made it a party to the JDA.

**B. The 2020 Butler County Action**

Above, we explained the underlying facts and procedural posture of the 2020 Butler County Action. *See supra* at **6-7. To quickly summarize, Appellant MDS, acting in its capacity as "managing partner for [Appellant MDS-2018]," filed a complaint against PennEnergy in the Butler County Court of Common Pleas, asserting the sole claim of tortious interference with contract. The trial court sustained PennEnergy's preliminary objections, dismissed the complaint without prejudice, and granted Appellants 20 days leave to file an amended complaint "to clarify the relationship between MDS Energy Development, LLC and MDS 2018-LP." Trial Court Order, 3/8/21, at 1-2. Appellants did not amend the complaint and, on April 1, 2021, the case was dismissed "without prejudice." *See* Docket Entry, 4/1/21, at 1.

The 2020 Butler County Action cannot collaterally estop Appellant MDS from now claiming that its November 27, 2018 Notice of Joinder made it a party to the JDA. At the outset, the 2020 Butler County Action did not result in a final judgment on the merits. Indeed, there exist two separate and

independent bases for this conclusion: 1) Appellants' complaint in the 2020 Butler County Action was dismissed at the preliminary objection stage "without prejudice," with leave to replead; *see Application of Pa. Turnpike Comm'n*, 715 A.2d 1219, 1222-1223 (Pa. Cmwlth. 1998) (where the trial court sustained the preliminary objections and dismissed the action in the prior case, "the resolution of that [prior] case was not a judgment or adjudication on the merits[ and, therefore,] the doctrine of collateral estoppel is inapplicable");[11] and 2) the 2020 Butler County Action was ultimately dismissed "without prejudice;" *see In re Bell*, 25 A.2d 344, 350 (Pa. 1942) ("[t]he phrase 'without prejudice' ordinarily imports the contemplation of further proceedings and when it appears in an order or decree it shows that the judicial act done is not intended to be *res judicata* of the merits of the controversy"); *cf. Gutman v. Giordano*, 557 A.2d 782, 783-784 (Pa. Super. 1989) ("when an action is dismissed with prejudice for failure to prosecute a claim, . . . it is not an adjudication on the merits") (quotation marks and citations omitted).

Moreover, the issue decided in the 2020 Butler County Action is not identical to the one presented here and Appellant MDS did not have "a full and fair opportunity to litigate the [presently-contested] issue in the prior action."

---

[11] *But see Stilp v. Commonwealth*, 974 A.2d 491, 499 n.7 (Pa. 2009) (declaring: where resolution of the issue was decided in a prior action *via* a preliminary objection **in the nature of a demurrer**, a subsequent challenge involving the same issue was "arguably barred by *res judicata*/collateral estoppel").

*See Rue*, 713 A.2d at 84. To be sure, in the 2020 Butler County Action, Appellant MDS did not sue in its own right. Rather, it expressly sued in its capacity as "managing partner for [Appellant MDS-2018]."[12] Therefore, in the 2020 Butler County Action, Appellants could have rightfully taken the position that the November 27, 2018 Notice of Joinder did not make **Appellant MDS-2018** a party to the JDA, while they currently raise a completely separate issue – based on a distinct set of facts and legal principles – and claim that the November 27, 2018 Notice of Joinder made **Appellant MDS** a party to the JDA.[13]

Therefore, since at least three of the four requirements for application of collateral estoppel are lacking, the 2020 Butler County Action cannot collaterally estop Appellant MDS from claiming that the November 27, 2018 Notice of Joinder made it a party to the JDA. The trial court erred in so holding.

_____

[12] In the 2020 Butler County Action, PennEnergy was well-aware of the fact that Appellant MDS was not suing in its own right. Certainly, in its preliminary objections to the complaint in the 2020 Butler County Action, PennEnergy expressly claimed that the trial court must strike any claims for relief in the complaint that could be construed as requesting relief for Appellant MDS, as Appellant MDS "[wa]s not a party" to the action. *See* PennEnergy's Preliminary Objections in the 2020 Butler County Action, 12/28/20, at 21 (declaring: "the complaint contains impertinent matter in the nature of averments and a prayer for relief involving alleged harm and damages to [Appellant MDS,] which is not a party") (some capitalization omitted).

[13] Indeed, as we explained above, since Appellant MDS-2018 was not a party to the November 27, 2018 Notice of Joinder and since the JDA specifically disclaimed "third-party beneficiary rights in any Person not party to" the JDA, Appellant MDS-2018 was not a party to the JDA and thus was not subject to the JDA's arbitration provision. *See supra* at **19-20.

**III. The Trial Court Erred in Concluding that PennEnergy's Judicial Estoppel Claim Justifies or Supports a Stay of Arbitration**

Appellants next claim the trial court erred when it concluded that judicial estoppel prevented Appellant MDS from claiming the November 27, 2018 Notice of Joinder made it a party to the JDA.

Our Supreme Court has explained:

> Judicial estoppel is an equitable, judicially-created doctrine designed to protect the integrity of the courts by preventing litigants from "playing fast and loose" with the judicial system by adopting whatever position suits the moment. Unlike collateral estoppel or *res judicata*, it does not depend on relationships between parties, but rather on the relationship of one party to one or more tribunals. In essence, the doctrine prohibits parties from switching legal positions to suit their own ends.

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1192 (Pa. 2001); *see also In re Adoption of S.A.J.*, 838 A.2d 616, 620 (Pa. 2003) ("[a]s a general rule, a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained").

As our above discussion has shown, neither the 2019 arbitration action nor the 2020 Butler County Action can judicially estop Appellant MDS from now claiming that the November 27, 2018 Notice of Joinder made it a party to the JDA, as Appellant MDS has never "assum[ed] a position inconsistent with" its current position. *See S.A.J.*, 838 A.2d at 620. Succinctly stated,

- 38 -

the 2019 arbitration action concerned a different Notice of Joinder – the joinder agreement entered on February 5, 2018, which is a completely different contract, dealing with different wellbores, and with different operative language, different deliveries, and different delivery dates. *See supra* at **31-34. Given these factual dissimilarities, it is not inconsistent for Appellant MDS to claim that the November 27, 2018 Notice of Joinder made it a party to the JDA, while the completely separate February 5, 2018 Notice of Joinder did not. Moreover, the 2020 Butler County Action sought recovery for Appellant MDS-2018, not Appellant MDS; and, as was explained above, Appellant MDS-2018 was not a party to the November 27, 2018 Notice of Joinder. *See supra* at **34-36. Given these factors, it is not inconsistent for Appellant MDS to now claim that the November 27, 2018 Notice of Joinder bound it, but perhaps not Appellant MDS-2018, to the JDA.

Thus, we conclude that the trial court erred when it held that judicial estoppel bars Appellant MDS's current position.

## IV. The Trial Court Erred in Concluding that PennEnergy's Waiver Claims Entitled it to a Stay of Arbitration

Within PennEnergy's dispositive motion, PennEnergy contended that Appellant MDS waived its claim that it was a party to the JDA because: 1) Appellant MDS initiated the 2020 Butler County Action and defended against PennEnergy's preliminary objections and, thus, Appellant MDS "waived any right to proceed to arbitration" and 2) Appellant MDS did not join its current

breach of contract claim in the 2020 Butler County Action and, under Pennsylvania Rule of Civil Procedure 1020(d), the claim is now waived. *See* PennEnergy's Motion for Preliminary Injunction, 10/31/22, at 15-16. Seemingly, the trial court accepted PennEnergy's arguments, granted PennEnergy's motion for a preliminary injunction, and stayed the arbitration proceedings. *See* Trial Court Opinion, 1/12/23, at 6. We conclude that the trial court's ruling was made in error.

Both of PennEnergy's waiver claims are based upon what occurred during the 2020 Butler County Action. First, PennEnergy claimed, when Appellant MDS initiated the 2020 Butler County Action and defended against PennEnergy's preliminary objections in that forum, Appellant MDS "waived any right to proceed to arbitration." *See id.* This argument is grounded in our precedent, which holds: "[a] party that avails itself of the judicial process by attempting to win favorable rulings from the judicial system following the filing of a complaint waives the right to proceed through arbitration." *DiDonato v. Ski Shawnee, Inc.*, 242 A.3d 312, 318 (Pa. Super. 2020).[14]

_____

[14] We explained:

> When deciding whether a party accepted judicial process to constitute waiver of a claim to arbitration, courts assess whether the party: (1) failed to raise the issue of arbitration promptly; (2) engaged in discovery; (3) filed pretrial motions that do not raise the issue of arbitration; (4) waited for adverse rulings on pre-trial motions before asserting arbitration; or (5) waited until the case is ready for trial before asserting arbitration. Significantly, a party cannot avail itself of the judicial process and then pursue an

*(Footnote Continued Next Page)*

Second, PennEnergy claimed, Appellant MDS waived its current claim because the claim was not asserted in the 2020 Butler County Action and, under Pennsylvania Rule of Civil Procedure 1020(d), the claim is now waived. Rule 1020(d) declares:

> If a transaction or occurrence gives rise to more than one cause of action heretofore asserted in assumpsit and trespass, against the same person, including causes of action in the alternative, they shall be joined in separate counts in the action against any such person. Failure to join a cause of action as required by this subdivision shall be deemed a waiver of that cause of action as against all parties to the action.

Pa.R.C.P. 1020(d).

Again, however, neither claim of waiver can succeed in this case because the 2020 Butler County Action was brought in the name of Appellant MDS-2018.  As explained above, Appellant MDS-2018 was not a party to the November 27, 2018 Notice of Joinder and, thus, Appellant MDS-2018 was never made a party to the JDA and was not subject to the JDA's arbitration provision.  Since MDS-2018 was never a party to the JDA, it had no breach of contract claim to assert against PennEnergy in the 2020 Butler County Action.

---

alternate route when it receives an adverse judgment.  To allow litigants to pursue that course and thereby avoid the waiver doctrine and our rules of court is to advocate judicial inefficiency; this we are unwilling to do.  Nevertheless, the mere filing of a complaint or answer without resulting prejudice to the objecting party will not justify a finding of waiver of the right to arbitration.

*DiDonato*, 242 A.3d at 318-319 (quotation marks and citations omitted).

- 41 -

Notwithstanding, it was entirely proper for Appellant MDS-2018 to litigate a potentially viable **tortious interference** claim before the Butler County Court of Common Pleas.

On the other hand, Appellant MDS was a party to the November 27, 2018 Notice of Joinder and, for purposes of this appeal, Appellant MDS became a party to the JDA on December 1, 2018. Since Appellant MDS's current claims are subject to the JDA's arbitration provision, Appellant MDS was entitled to bring its own claim in AAA arbitration, regardless of judicial inefficiency concerns. This conclusion is compelled by our Supreme Court's opinion in *Taylor v. Extendicare Health Facilities, Inc.*, 147 A.3d 490 (Pa. 2016).

In *Taylor*, the defendant nursing home was a party to an arbitration agreement with the decedent, which "requir[ed] the arbitration of claims arising from [the decedent's] stay at the" nursing home. *Taylor*, 147 A.3d at 493. Following the decedent's death, her relatives "brought wrongful death claims on behalf of themselves as wrongful death beneficiaries and survival claims on behalf of [the decedent's] estate against" the nursing home. *Id.* The nursing home then "moved to bifurcate the wrongful death and survival actions, and to compel arbitration of [the decedent's] survival claim pursuant to the arbitration agreement and the FAA." *Id.*

The trial court in *Taylor* noted that the wrongful death beneficiaries were non-signatories to the arbitration agreement and, as such, could not be compelled to arbitrate their wrongful death claims against the nursing home. *See id.* at 495; *see also Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651,

663 (Pa. Super. 2013) (holding: "[the d]ecedent's contractual agreement with [a nursing home] to arbitrate all claims was not binding on the non-signatory wrongful death claimants"). The trial court further noted that Pennsylvania Rule of Civil Procedure 213(e) demands that wrongful death and survival actions be joined in a single judicial action. *See Taylor*, 147 A.3d at 495. The trial court reasoned that, since the non-signatories could not be compelled to arbitrate their wrongful death claims and, since Rule 213(e) required the consolidation of the wrongful death and survival actions, it was required to deny the nursing home's bifurcation motion and order that the entire action be resolved in the court of common pleas, notwithstanding the arbitration agreement between the decedent and the nursing home. *See id.* After this Court affirmed the trial court's order, the Pennsylvania Supreme Court reversed.

In reversing, the *Taylor* Court initially observed:

> Section 2 of the FAA binds state courts to compel arbitration of claims subject to an arbitration agreement. 9 U.S.C. § 2 (providing that arbitration agreements "shall be valid, irrevocable, and enforceable"). This directive is mandatory, requiring parties to proceed to arbitration on issues subject to a valid arbitration agreement, even if a state law would otherwise exclude it from arbitration.

*Id.* at 509.

The Supreme Court held that, to the extent "the compulsory joinder mandate of Rule 213(e) could bar the trial court from bifurcating the [] arbitrable survival action from its pending litigation in state court," Rule

213(e) "stands as an obstacle to achieving the objectives of Congress in enacting the FAA" and, as applied, Rule 213(e) was preempted by the FAA. *See id.* at 509-510 (some quotation marks omitted). The Supreme Court noted:

> the FAA's objectives are to ensure the enforcement of arbitration agreements and facilitate streamlined proceedings. Arbitration of a single claim under the facts presented herein, with multiple plaintiffs and defendants and several causes of action remaining in state court, likely will not lower costs or enhance efficiency. Therefore, the scenario that we are addressing arguably presents a conflict between the two objectives of the FAA, where enforcing the ADR Agreement between [the decedent and the nursing home] will satisfy the enforcement objective at the expense of efficiency. Under such circumstances, we are bound by the [United States] Supreme Court's directive to favor enforcement over efficiency. The Supreme Court has made clear that bifurcation and piecemeal litigation is the tribute that must be paid to Congressional intent.

*Id.* at 510; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983) (declaring: "The Hospital points out that it has two substantive disputes here—one with Mercury, concerning Mercury's claim for delay and impact costs, and the other with the Architect, concerning the Hospital's claim for indemnity for any liability it may have to Mercury. The latter dispute cannot be sent to arbitration without the Architect's consent, since there is no arbitration agreement between the Hospital and the Architect. It is true, therefore, that if Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve these related disputes in different forums. That misfortune, however, is not the result of any choice

between the federal and state courts; it occurs because the relevant federal law **requires** piecemeal resolution when necessary to give effect to an arbitration agreement. Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement. If the dispute between Mercury and the Hospital is arbitrable under the Act, then the Hospital's two disputes will be resolved separately—one in arbitration, and the other (if at all) in state-court litigation") (footnotes and some emphasis omitted).

As noted above, for purposes of this appeal, Appellant MDS became a party to the JDA on December 1, 2018 and, under the arbitration provision contained in the JDA, Appellant MDS was entitled to arbitrate its current breach of contract claim against PennEnergy. This is true regardless of what occurred during the 2020 Butler County Action, as that action was prosecuted in the name of Appellant MDS-2018, who was never a party to the JDA or its arbitration provision. As our Supreme Court held in **Taylor**, even if this constitutes "bifurcat[ed] and piecemeal litigation," it "is the tribute that must be paid to Congressional intent." **Taylor**, 147 A.3d at 510.

Thus, since Appellant MDS did not "avail[] itself of the judicial process" during the 2020 Butler County Action and, further, since Appellant MDS was not required to "join [its arbitrable] cause of action" in that action, the trial court erred in concluding Appellant MDS waived its claim that it was a party to the JDA. **See DiDonato**, 242 A.3d at 318; Pa.R.C.P. 1020(d).

## V. Conclusion

We conclude the trial court erred when it held PennEnergy was likely to prevail on the merits regarding its claim that Appellant MDS was not a party to the JDA or subject to the JDA's arbitration provision.  As such, we conclude that the trial court erred when it granted PennEnergy's Motion for Preliminary Injunction against Appellant MDS.  ***See Allegheny County v. Commonwealth***, 544 A.2d 1305, 1307 (Pa. 1988) ("[f]or a preliminary injunction to issue, every one of the[] prerequisites must be established; if the petitioner fails to establish any one of them, there is no need to address the others").

Order affirmed as to Appellant MDS-2018.  Order vacated as to Appellant MDS.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 9/20/2024